## S96P1750. CARR v. THE STATE.
(480 SE2d 583)

HUNSTEIN, Justice.

Timothy Don Carr was convicted of the malice murder of Keith Patrick Young and the theft of his motor vehicle. The jury recommended the death penalty for the murder, finding the following aggravating circumstances: the murder was committed in the commission of an armed robbery and aggravated battery; the murder was committed for receiving things of monetary value; and the murder was outrageously and wantonly vile, horrible and inhuman in that it involved torture, depravity of mind and aggravated battery to the victim. OCGA § 17-10-30 (b) (2), (4), (7). The trial court sentenced Carr to death and Carr appeals.[1] We affirm.

---

[1] The crimes occurred on October 8, 1992. Carr was indicted by the Monroe County Grand Jury for malice murder, felony murder, armed robbery, and theft of a motor vehicle

1. The jury was authorized to find that Carr, his girl friend Melissa Burgeson, and the 17-year-old victim attended a party on the evening of the crimes, where they all consumed alcohol and used drugs. Carr and Burgeson discussed robbing the victim at the party. In the early hours of the following day, Burgeson took the victim's car keys and talked him into letting her drive him home. Burgeson drove the victim, Carr, and two juveniles to a remote area of south Monroe County in the victim's car. During the ride, Carr showed one of the juveniles a large knife and whispered that he intended to kill the victim. Burgeson stopped the car on a dirt road, and when the victim opened the trunk to look for more drugs, Burgeson motioned to Carr to kill him. Carr grabbed the victim's hair, pulled his head back and slashed his throat. At Burgeson's urging, Carr stabbed the victim repeatedly and then beat him in the head with a baseball bat. After Burgeson took the victim's money, Carr and one of the juveniles dragged the victim's body to the roadside, leaving him to die from his injuries.

Carr and Burgeson fled to Tennessee in the victim's car and were arrested following a high speed chase. After receiving medical treatment at a local hospital, they were placed in the back of a police car in which police had activated a hidden tape recorder. Their recorded conversation, in which Carr admitted killing the victim, was introduced into evidence at Carr's trial.[2] The jury was also authorized to find from the evidence that the knife used to stab the victim was discovered in Burgeson's purse.

The evidence adduced was sufficient to enable a rational juror to find Carr guilty of the crimes charged beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Carr contends that the trial court failed to require a complete record of the trial proceedings and deprived Carr of an opportunity to reconstruct the unrecorded proceedings, thereby abridging his right

---

on November 16, 1992. On December 3, 1992, the State filed a notice of intent to seek the death penalty. The jury found Carr guilty on all counts on April 27, 1994. The following day, the jury returned its recommendation of the death sentence and the trial court imposed that sentence, plus 20 years imprisonment for theft of a motor vehicle. Carr's motion for new trial, filed May 13, 1994 and amended August 29, 1994 and September 27, 1995, was denied October 24, 1995. Carr filed a notice of appeal to this Court on November 22, 1995. On February 16, 1996, the case was remanded on motion of the Attorney General to determine whether the record required supplementation. The remand hearing was held April 17, 1996, and on May 16, 1996, the trial court entered an order stating that the record was complete. The trial court subsequently denied Carr's motions for continuance, for an evidentiary hearing, and for reconsideration of the court's May 1996 order. The case was redocketed July 30, 1996. Carr filed a second motion to remand on August 13, 1996, which was denied September 20, 1996. The case was orally argued on October 15, 1996.

[2] Burgeson was also charged in connection with these crimes. She was convicted of malice murder and sentenced to life in prison. This Court affirmed Burgeson's conviction in *Burgeson v. State*, 267 Ga. 102 (475 SE2d 580) (1996).

to appeal. Prior to the hearing on his motion for new trial, Carr informed the court that there were material omissions in the trial transcript because certain in-chambers conferences and bench conferences had not been recorded and requested that the motion for new trial be held in abeyance pending completion of the record. The trial court noted that although the transcript had been available for more than a year, Carr had not earlier raised the issue of the omissions with the court. The court also noted that Carr was responsible for ensuring that the record accurately reflected events which occurred in chambers, since there was no reporter present. After hearing argument on this issue from both parties, the trial court refused to postpone the motion for new trial and denied Carr's request to supplement the record by written order without further elaboration.

After Carr's motion for new trial was denied and the case was docketed in this Court, Carr raised the issue of supplementation in his appellate brief. Upon motion of the Attorney General, we remanded Carr's case to the trial court until such time as the record was supplemented or the trial court entered an order stating it was complete. At the close of the remand hearing, the trial court stated that the parties could not agree on supplementation and issued a written order finding that there were no further proceedings to be transcribed and the transcript was complete. Carr seeks a second remand[3] from this Court, arguing that the trial court did not give him adequate notice of the remand hearing and that the procedures followed at the hearing failed to comply with the procedures set out in OCGA § 5-6-41 (f) for reconstructing a transcript.

Carr's contention that he did not receive sufficient notice of the remand hearing is without merit. The transcript had been published for almost two years prior to the remand hearing. Carr was aware of any omissions in the transcript at least seven months prior to the hearing, when he first raised the issue of supplementation in the trial court, and he had two months between the issuance of the remand order in this Court and the hearing in the trial court in which to prepare a summary of the missing portions of the transcript.

At the remand hearing, Carr attempted to supplement the record with events which allegedly occurred during three in-chambers conferences. The first conference occurred on the day before trial when Carr suffered an allergic reaction in prison and was treated by a doctor at the court's request. The trial court read a sum-

---

[3] Prior to filing his brief in this Court, Carr filed a second motion to remand for the reasons stated here, which we denied on September 20, 1996.

mary of these events into the record prior to opening argument, which the parties agreed was accurate. Carr sought the trial court's permission to hold a second "evidentiary hearing" to bring in witnesses to supply additional details regarding this incident, as well as new evidence that Carr had been given other medications during trial. The purpose of this testimony was to support an argument that Carr was incompetent during trial, although no competency claim had been raised in the trial court.

OCGA § 5-6-41 (f) establishes a procedure whereby a party who contends that the transcript or record does not truly or fully disclose what transpired at trial may have the record completed either by stipulation of the parties as to what occurred or the independent recollection of the trial judge. If anything material to either party is omitted from the record, the omission may be corrected and, if necessary, a supplemental record filed. *Zachary v. State*, 245 Ga. 2 (2) (262 SE2d 779) (1980). Evidence never actually admitted at trial cannot properly become part of the record on appeal pursuant to OCGA § 5-6-41 (f). "That section is solely for the purpose of making the record speak the truth, not for adding evidence to the record or supplying fatal deficiencies after the fact. [Cit.]" *Harp v. State*, 204 Ga. App. 527-528 (1) (420 SE2d 6) (1992). See also *State v. Pike*, 253 Ga. 304, 307 (320 SE2d 355) (1984). The trial court did not err in refusing to consider this evidence.

Carr contends that a second unrecorded conference would show that the trial court denied him a *Jackson v. Denno*[4] hearing on the voluntariness of his incriminating statements to Burgeson in the police car. (See Division 4, infra.) Since we find that Carr was afforded a full and fair hearing on his motion to suppress these statements, the failure to record this exchange is harmless. See *Davis v. State*, 242 Ga. 901 (1) (252 SE2d 443) (1979).

During a third unrecorded conference, several prospective jurors were excused by the trial court. Carr did not object to their excusal at trial, in his brief on appeal, or at the remand hearing. Therefore, the failure to record this conference is harmless. See generally *Whitt v. State*, 215 Ga. App. 704, 710 (452 SE2d 125) (1994).

Carr contended at the remand hearing that he advised the court at several of the unrecorded bench conferences that he was in pain throughout the trial from the "shock belt" he was wearing for security purposes and that the jury's impression of his demeanor at trial may have been affected thereby. The prosecution disputed Carr's claim and the trial court, drawing on its own recollection, ruled that the court was not told Carr was suffering during the trial. Under

---

[4] *Jackson v. Denno*, 378 U. S. 368 (84 SC 1774, 12 LE2d 908) (1964).

OCGA § 5-6-41 (g), where the parties cannot agree on what occurred during the unrecorded portions of the trial, the trial court's ruling on the accuracy of the transcript is final and is not subject to appellate review. *Smith v. State*, 260 Ga. 274 (3) (393 SE2d 229) (1990).

Carr also sought to present testimony from witnesses who were in the courtroom prior to the trial when the clerk of the court made certain comments in the presence of the jury and out of the hearing of the judge and the prosecutor. This evidence was not part of the trial proceeding and was not admissible under OCGA § 5-6-41 (f). *Harp*, supra.

After reviewing the transcript of the remand hearing and the arguments raised in Carr's motions and brief regarding this issue, we find that the procedures followed by the trial court at the remand hearing complied with the provisions of OCGA § 5-6-41 (f). We therefore hold that Carr is not entitled to a second hearing for this purpose. We further find that the trial court did not abuse its discretion in concluding that nothing material was omitted from the trial record. Our resolution of the issues raised in this appeal does not rely on any unrecorded proceedings, and the trial transcript is sufficiently complete to afford a full and fair review of Carr's arguments. *Zachary*, supra at 4. See also *Dobbs v. Zant*, 506 U. S. 357 (113 SC 835, 122 LE2d 103) (1993). Carr has not established that he was prevented from raising any viable issue on appeal as a result of the failure to record any proceedings below.

## Pretrial Proceedings

3. Carr argues that the trial court erred by denying his motion to suppress the recorded conversation between Carr and his co-defendant, Melissa Burgeson, in which Carr admitted killing Young. The recording of this conversation was introduced at Burgeson's trial. We rejected Burgeson's arguments on appeal that introduction of these statements violated *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966), and the state and federal wiretapping statutes. We upheld the trial court's finding that *Miranda* did not apply, since the statements were not the result of an in-custody interrogation. *Burgeson*, supra at (3) (c). See also *Thomas v. State*, 243 Ga. 217, 218 (253 SE2d 190) (1979). We also found that introduction of the statements did not offend the federal or state wiretapping statutes because Burgeson had no reasonable expectation of privacy in the back of a police car. *Burgeson*, supra at (3) (d). See also *United States v. McKinnon*, 985 F2d 525 (11th Cir. 1993).

Carr argues that we should revisit the issue of whether admission of these statements violated *Miranda* in light of the U. S. Supreme Court's decision in *Rhode Island v. Innis*, 446 U. S. 291 (II)

(A) (100 SC 1682, 64 LE2d 297) (1980), in which the U. S. Supreme Court held that custodial interrogation encompasses not only direct questioning by the police, but also its "functional equivalent," i.e., "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (Footnotes omitted.) Id. at 301. Carr contends that at the time the statements were made, he and Burgeson were young, scared, and disoriented due to post-arrest medication they had been given for their injuries. Hence, Carr asserts that placing them together in a patrol car, with a tape recorder operating, was the "functional equivalent" to interrogation under *Innis*, in that police knew or should have known the co-defendants were likely to incriminate themselves.

The facts of this case do not present a sufficient likelihood of incrimination to satisfy the legal standard articulated in *Miranda* and *Innis*. Merely placing two suspects, who were arrested together, in a police car, without having interrogated either, is not the kind of police ploy designed to elicit an incriminating response from defendants proscribed by *Innis*.[5] Although police planted the tape recorder hoping Carr and Burgeson would discuss the crime, "[o]fficers do not interrogate a suspect simply by hoping that he will incriminate himself." *Arizona v. Mauro*, 481 U. S. 520, 527 (107 SC 1931, 95 LE2d 458) (1987). The resolution of this issue is controlled by our earlier holding in *Burgeson*, supra. Carr's statements were not the product of interrogation and were not protected by the Fifth Amendment.

4. Carr contends that the trial court erred by denying his request for a *Jackson v. Denno* hearing and by failing to rule on the voluntariness of his statements to Burgeson. Following a full and fair hearing on Carr's motion to suppress, the trial court properly found that the statements were not the product of interrogation. On the first day of trial, Carr sought and received the court's permission to argue an additional basis for suppression, namely, that the statements were involuntary because he was on medication at the time they were made. The trial court properly ruled that while this was part of the circumstances surrounding the statements and could be considered by the jury, the fact that Carr was on medication provided no independent basis for suppression and reaffirmed its earlier ruling. See generally *Larry v. State*, 266 Ga. 284 (2) (b) (466 SE2d 850) (1996). No second hearing on voluntariness was required under *Jackson v. Denno*, since this issue was considered by the court in its earlier rul-

---

[5] Such ploys include the use of coached witnesses to identify a suspect from a lineup and positing the guilt of the suspect in an attempt to minimize the gravity of the crime. *Arizona v. Mauro*, 481 U. S. 520, 526 (107 SC 1931, 95 LE2d 458) (1987).

ing that the statements were not the product of interrogation.

## Voir Dire

5. Carr argues that the trial court erred in relying on prospective juror Myra Bittick's assurances of impartiality, because Bittick's son was the Sheriff of Monroe County at the time of trial and her voir dire responses proved her bias towards the State.

A trial court may not rely solely on a prospective juror's assurances of his impartiality where the record shows on its face compelling circumstances supporting disqualification, without making additional factual findings in support of the ruling. *Walker v. State*, 262 Ga. 694 (2) (424 SE2d 782) (1993); *Lively v. State*, 262 Ga. 510 (1) (421 SE2d 528) (1992). Unlike the prospective jurors in *Lively* and *Walker*, Myra Bittick was not related or connected in any manner to the victim or either of the co-defendants. Although her son played a limited role in the investigation,[6] he was not a prosecutor or witness in the case, and Bittick testified that she never discussed the case with him. Because the compelling circumstances supporting disqualification present in *Lively* and *Walker* are absent in Bittick's case, the trial court was entitled to rely on her voir dire responses in determining her qualifications to serve as a juror. See *Garland v. State*, 263 Ga. 495 (1) (435 SE2d 431) (1993).

The facts in this case are also distinguishable from those in *Beam v. State*, 260 Ga. 784 (2) (400 SE2d 327) (1991), cited by Carr for his contention that Bittick should have been excused to avoid the "appearance of impropriety." The prospective juror in *Beam* was employed by the district attorney; Bittick had no connection to the prosecutor.

Carr's contention that Bittick's voir dire responses revealed her bias in favor of the State is not supported by the record. Excusal for bias is required when it is shown a juror has a fixed opinion regarding the guilt of the accused which cannot be changed by the evidence. *Garland*, supra at 496. Bittick's assurances of her impartiality were unequivocal. Although Bittick testified that her son undoubtedly believed in Carr's guilt, it would have to be proven to her. Bittick added that she had served on a jury in a criminal case when her husband was the sheriff and voted to acquit the defendant.

In *Brantley v. State*, 262 Ga. 786 (2) (e) (427 SE2d 758) (1993), we held that a sheriff's wife was not disqualified per se from serving on a criminal jury, even though her husband had assisted the prose-

---

[6] Sheriff Bittick accompanied the prosecutor to Tennessee to transport the juveniles involved in the case back to Georgia. Carr also contends that Bittick assisted with jury selection and assisted the medical examiner in preparing the case for trial.

cution with jury selection, where the sheriff was not a witness in the case, his wife did not discuss the case with him, and the prospective juror's voir dire responses did not support a challenge for cause. The circumstances in this case are similar, and the trial court did not abuse its discretion in refusing to disqualify Bittick.

6. Carr argues that the trial court erred in failing to strike jurors Linda Hunnicutt and Jeffrey Kendrick for bias in favor of the death penalty.

(a) In response to questioning by Carr, Hunnicutt stated that she could not think of any mitigating circumstances which would justify a life sentence if Carr was found guilty of murder. A juror's inability to list mitigating circumstances does not justify excusal for cause under *Wainwright v. Witt*, 469 U. S. 412, 424-426 (II) (105 SC 844, 83 LE2d 841) (1985), and it is improper to require the juror to enumerate hypothetical circumstances in which she might or might not vote to impose the death penalty. See *Crowe v. State*, 265 Ga. 582 (9) (a) (458 SE2d 799) (1995). The relevant issue is whether the juror has the ability to consider mitigating evidence and the option of a life sentence. *Morgan v. Illinois*, 504 U. S. 719, 738 (112 SC 2222, 119 LE2d 492) (1992). When questioned by the trial court, Hunnicutt later stated that she did not mean to imply by her earlier responses that she would automatically vote for the death penalty in every case where the defendant was convicted. Compare *Pope v. State*, 256 Ga. 195 (7) (e) (345 SE2d 831) (1986). While there was some equivocation in Hunnicutt's responses as to whether she would automatically vote to impose the death penalty, the record supports the trial court's finding that she was capable of serving as an impartial juror and would consider both evidence in mitigation and the option of a life sentence. See *Hittson v. State*, 264 Ga. 682 (6) (h) (449 SE2d 586) (1994).

(b) Carr argues that the trial court abused its discretion in failing to sua sponte strike prospective juror Kendrick, based on Kendrick's "highly prejudicial" statements during voir dire. When asked for his views on capital punishment in general, Kendrick stated that the death penalty had limited effect as a deterrent to crime because there were too many convicted murderers on death row and that prison authorities "should light one up a day." It was not shown that Kendrick's view of the lengthy appeals process or the effectiveness of the death penalty as a deterrent would lead him to vote for death in every case or even reflected a predisposition towards the death penalty. The argument that a defendant is entitled to jurors who believe the death penalty will actually be carried out has been rejected by the court. *Ingram v. State*, 253 Ga. 622 (2) (f) (323 SE2d 801) (1984). Kendrick later stated that he would not automatically vote for a death sentence but could consider both options based on the evi-

dence. See *Wainwright v. Witt*, supra; *Hittson*, supra at 687-688. The trial court did not abuse its discretion in failing to strike Kendrick for cause on its own motion. *Childs v. State*, 257 Ga. 243 (7) (357 SE2d 48) (1987).

### Guilt-Innocence Phase

7. Carr contends portions of the prosecutor's guilt-innocence phase closing argument were improper. Since Carr made no contemporaneous objection to any part of the argument, the test for reversible error is whether there is a reasonable probability that the improper argument changed the result of the trial. *Todd v. State*, 261 Ga. 766 (2) (a) (410 SE2d 725) (1991).

(a) Carr contends that the prosecutor improperly compared his case to the widely-publicized Menendez murder case in California, by arguing that Carr, like the Menendez brothers and many other defendants today, offered excuses for his crimes, such as a battered childhood. Carr asserts that this reference to an unrelated murder case was an improper expression of the prosecutor's personal opinion, which invited the jury to consider facts not in evidence.

Analogizing a defendant or a defendant's case to another well-known defendant or case is permissible during argument if the analogy is supported by facts in evidence. See *Robinson v. State*, 257 Ga. 194 (4) (357 SE2d 74) (1987). We have long held that counsel may make use of "well-established historical facts in his argument and make full use of illustrations as long as he does not introduce 'extrinsic and prejudicial matters' which have no basis in the evidence in the case." Id. Thus, we have found a prosecutor's references to well-known individuals, like Charles Manson and Jim Jones, to illustrate how an individual may obtain control of another, are within the wide latitude allowed in closing argument, provided there is an evidentiary basis for these illustrations. *Robinson*, supra at 196 (4). See also *Ward v. State*, 262 Ga. 293 (6) (f) (417 SE2d 130) (1992).

Carr testified in his own defense at trial that he was sexually abused by his father as a child; Burgeson was a witch who coerced him to kill the victim; he was under the influence of alcohol and drugs on the night of the crime; and he did not remember killing the victim. As Carr points out in his brief, the Menendez brothers are widely known for their attempt to justify the murder of their parents by claiming one of the brothers was sexually abused by their father. We find that the prosecution's comparison of Carr's failure to offer any legal justification for his acts with the Menendez brothers' claim that sexual abuse by their father justified the murder of their parents was proper argument, since the analogy had a basis in evidence adduced at trial. Compare *Bell v. State*, 263 Ga. 776 (439 SE2d 480)

(1994).

(b) Carr contends that the prosecutor improperly expressed his personal opinion that Carr was guilty of the charged crimes by prefacing portions of his argument with phrases such as "I have no doubt," "I think" and "I don't believe." Considered in context, the most reasonable interpretation of these comments is that the prosecutor was asking jurors to draw inferences from evidence. Inferences drawn from facts adduced at trial are acceptable argument, and the fact that the inferences may have been improperly couched in the framework of a personal opinion does not render them reversible error. *Conklin v. State*, 254 Ga. 558 (11) (a) (331 SE2d 532) (1985).

(c) We find no merit in Carr's contention that reversible error resulted from the prosecutor's exhortations to the jury either to "send a message" to Carr and other criminals who would commit crimes in the county by convicting Carr or to "pray" before deliberating. It is not improper for a prosecutor to appeal to a jury to convict in order to "send a message" to the community. See *Philmore v. State*, 263 Ga. 67 (3) (428 SE2d 329) (1993). While references to religion which invite jurors to base their verdict on extraneous matters not in evidence should be avoided in prosecutorial argument, *Hill v. State*, 263 Ga. 37, 45-46 (19) (427 SE2d 770) (1993), the prosecutor prefaced the reference to prayer by urging the jurors not to make an emotional decision, but to review the facts and decide the case on the evidence. Even assuming the reference was improper, given its brevity, there is not sufficient prejudice to overcome the procedural default. Id.; *Todd*, supra at (2) (b).

### Sentencing Phase

8. Carr asserts that portions of the prosecutor's sentencing phase argument were improper. Since Carr expressly waived any objection to the argument, we need only determine whether there is a reasonable probability the improper argument changed the outcome of the sentencing proceeding. *Todd*, supra.

(a) Carr contends that the prosecutor's sentencing phase argument misled jurors as to their role in the sentencing process in violation of *Caldwell v. Mississippi*, 472 U. S. 320 (III) (105 SC 2633, 86 LE2d 231) (1985). The challenged language provided:

Now Ladies and Gentlemen, as I say, you're going to make the recommendation as to punishment. Now, don't misunderstand. You're not going to sentence this Defendant. The Judge is going to sentence him, and you should not feel that you are doing anything to Timothy Don Carr. It's your job to listen to the evidence, to evaluate the evidence, and to

decide the appropriate punishment, and then you make a recommendation as a jury.

The prosecutor in *Caldwell,* in remarks which were characterized by the U. S. Supreme Court as "quite focused, unambiguous and strong," misled the jury to believe that the responsibility for sentencing the defendant lay elsewhere. Id., 472 U. S. at 340. The trial judge "not only failed to correct the prosecutor's remarks, but in fact openly agreed with them." Id. at 339. The U. S. Supreme Court has interpreted the plurality decision in *Caldwell* narrowly. See, e.g., *Romano v. Oklahoma,* 512 U. S. 1 (114 SC 2004, 129 LE2d 1) (1994); *Sawyer v. Smith,* 497 U. S. 227 (110 SC 2822, 111 LE2d 193) (1990). Thus, " '(t)o establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law.' [Cit.]" *Romano v. Oklahoma,* supra, 512 U. S. at 9. Viewed in context, the prosecutor's comments in this case do not contravene *Caldwell,* since the prosecutor's description of the jury's role was not an affirmative misstatement of the law and any confusion this isolated portion of argument may have engendered was alleviated by the repeated emphasis of the entire proceeding that the jury, and not the prosecutor or the court, was vested with the decision as to whether Carr should live or die.

Although the challenged remarks viewed in isolation may be construed as misleading, the comments were not uttered or heard in a vacuum and should be considered in the context of the entire sentencing proceeding. *Brooks v. Kemp,* 762 F2d 1383, 1413 (V) (11th Cir. 1985). For example, while the statutory term "recommend" in this context could be understood by a juror as indicating that the judge has the ultimate discretion to decide sentence, use of the term is not improper where the jury is instructed that their recommendation is binding. *Hittson,* supra at (14) (b). The jury's role as sole decision maker was reinforced throughout the entire sentencing phase proceeding. The prosecutor began his sentencing phase argument by stating that it was the jury, not the judge, which would "ultimately decide whether or not [Carr] would serve life in prison or be electrocuted in the Georgia electric chair." Elsewhere in his remarks, the prosecutor stressed to the jurors that it was they who had to make "the difficult decision" regarding the appropriate sentence. The prosecutor's statement that the jurors will not be "doing anything" to Carr, when read in context, refers to the prosecutor's comments throughout argument that it was Carr, himself, and not the jury, who was responsible for the consequences of his acts, and the jury was merely "reacting to the evidence" that Carr "created." We have previously found this argument to be an accurate description of the criminal justice process which does not diminish the jury's sense of

responsibility. See, e.g., *Potts v. State*, 261 Ga. 716 (27) (410 SE2d 89) (1991); *Hance v. State*, 254 Ga. 575 (5) (332 SE2d 287) (1985). See also *Waters v. Thomas*, 46 F3d 1506 (11) (11th Cir. 1995).

Any lingering confusion as to the jury's role would have been alleviated by Carr's closing argument and the trial court's charge. Carr made it clear that the jurors were the sole decision maker. The entire thrust of his argument was to impress on the jury its awesome responsibility in deciding punishment, by reminding the jurors that they held Carr's life in their hands, and their vote would determine whether Carr would live or die. Unlike the judge in *Caldwell*, the trial judge clearly instructed the jurors that if they recommended the death penalty, the court was required by law to sentence Carr to death.

After reviewing the transcript of the sentencing proceeding, we do not find the kind of egregious misinformation in the trial record that was present in *Caldwell*, supra. We are satisfied that the jurors labored under no misconception regarding their role, and they clearly understood that they alone bore the responsibility for deciding Carr's punishment.

(b) Carr argues that the prosecutor improperly commented on the weight of mitigating evidence and argued, as his personal opinion, that Carr's testimony regarding Carr's intoxication prior to the crime constituted an aggravating, rather than a mitigating, factor. We disagree. The State's role in the sentencing phase is to convince a jury that a particular defendant deserves the harshest punishment. *Walker v. State*, 254 Ga. 149 (14) (327 SE2d 475) (1985). The jury, and not the defendant, decides whether a particular circumstance is mitigating. *Spivey v. State*, 241 Ga. 477 (2) (246 SE2d 288) (1978). It follows that a prosecutor may argue that evidence presented by the defendant during sentencing is not mitigating. Although this contention was improperly phrased in the form of a personal opinion, it is clear from the argument as a whole that the prosecutor was not vouching personally as to whether intoxication was a mitigating circumstance, but was only arguing the State's position.

(c) Carr contends that the prosecutor expressed his personal opinion as to the value of Carr's life by arguing that neither he nor the doctors who testified on Carr's behalf knew whether there was any redeeming social value to Carr's life. While the expression of a prosecutor's personal opinion regarding the rehabilitative prospects of a capital defendant is improper, we do not find this isolated and equivocal remark was so prejudicial as to overcome the procedural default. See *Bowen v. Kemp*, 769 F2d 672, 678-679 (III) (11th Cir. 1985).

(d) Carr's contention that the prosecutor misstated Carr's trial testimony by commenting on his lack of remorse is without merit.

The prosecutor merely contrasted the content of Carr's trial testimony with Carr's demeanor on the witness stand and his statements to Burgeson, when he was unaware he was being recorded. A defendant's lack of remorse, as evidenced by his courtroom demeanor, is a permissible area of inquiry and argument during the sentencing phase of a capital trial. *Hammond v. State*, 264 Ga. 879 (8) (b) (452 SE2d 745) (1995); *Christenson v. State*, 261 Ga. 80 (7) (b) (402 SE2d 41) (1991).

9. The jury found the following aggravating circumstances: OCGA § 17-10-30 (b) (2) (the murder was committed while the defendant was engaged in the capital felony of armed robbery and aggravated battery); OCGA § 17-10-30 (b) (4) (the murder was committed for the purpose of receiving money and other things of monetary value); OCGA § 17-10-30 (b) (7) (the murder was outrageously and wantonly vile, horrible and inhuman in that it involved torture to the victim, depravity of mind and aggravated battery). The evidence supports these findings. OCGA § 17-10-35 (c) (2).

10. Carr's death sentence was not imposed as the result of impermissible passion, prejudice or other arbitrary factor. OCGA § 17-10-35 (c) (1).

11. Carr contends that his death sentence is excessive and disproportionate to the life sentence received by Melissa Burgeson, whom he claims was the "prime mover" in the crime. There is no simplistic rule that one co-defendant may not be sentenced to death when another co-defendant receives a lesser penalty, and each case must be judged on its unique factual circumstances. There are material distinctions between Carr's case and Burgeson's. It was Carr who slashed the victim's throat, repeatedly stabbed him and beat him in the head with the baseball bat. Although Carr testified that he was so intoxicated he had no memory of the crime, his statements to Burgeson indicate otherwise. Carr discussed with Burgeson the fact that they should have disposed of the knife as they did the baseball bat and suggested fabricating a defense of justification by claiming the victim tried to rape Burgeson. Given his degree of participation in the crimes and his apparent lack of remorse, Carr's sentence is not disproportionate to Burgeson's life sentence, or the penalty imposed upon the "triggerman" in many cases where the other participant did not receive a similar sentence, considering both the crime and the defendant. *Hall v. State*, 241 Ga. 252 (8) (244 SE2d 833) (1978); OCGA § 17-10-35 (c) (3).

12. The similar cases listed in the Appendix support the imposition of the death penalty in this case, in that all these cases involved the deliberate, unprovoked killing of a robbery victim, or victims, and thus show the willingness of juries to impose the death penalty under these circumstances.

*Judgment affirmed. All the Justices concur.*

APPENDIX.

*Christenson v. State*, 262 Ga. 638 (423 SE2d 252) (1992); *Ferrell v. State*, 261 Ga. 115 (401 SE2d 741) (1991); *Stripling v. State*, 261 Ga. 1 (401 SE2d 500) (1991); *Romine v. State*, 256 Ga. 521 (350 SE2d 446) (1986); *Cargill v. State*, 255 Ga. 616 (340 SE2d 891) (1986); *Ingram v. State*, 253 Ga. 622 (323 SE2d 801) (1984); *Spivey v. State*, 253 Ga. 187 (319 SE2d 420) (1984); *Putman v. State*, 251 Ga. 605 (308 SE2d 145) (1983); *Wilson v. State*, 250 Ga. 630 (300 SE2d 640) (1983); *Berryhill v. State*, 249 Ga. 442 (291 SE2d 685) (1982); *Dick v. State*, 246 Ga. 697 (273 SE2d 124) (1980). See also *Lee v. State*, 258 Ga. 82 (365 SE2d 99) (1988); *Ford v. State*, 257 Ga. 461 (360 SE2d 258) (1987); *Beck v. State*, 255 Ga. 483 (340 SE2d 9) (1986); *Roberts v. State*, 252 Ga. 227 (314 SE2d 83) (1984); *Mincey v. State*, 251 Ga. 255 (304 SE2d 882) (1983); *Solomon v. State*, 247 Ga. 27 (277 SE2d 1) (1981).

DECIDED FEBRUARY 3, 1997 —
RECONSIDERATION DENIED FEBRUARY 28, 1997.

*Harold E. Martin, Michael A. Dillon,* for appellant.
*Tommy K. Floyd, District Attorney, Marie R. Banks, Assistant District Attorney, Michael J. Bowers, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General,* for appellee.