## S97P0205. BISHOP v. THE STATE.
### (486 SE2d 887)

CARLEY, Justice.

The grand jury indicted Joshua Daniel Bishop for the malice
murder and armed robbery of Leverett Morrison. The State filed
notice of its intent to seek the death penalty for the murder. After
finding Bishop guilty of the crimes, the jury returned a verdict
imposing a death sentence, finding, as the aggravating circumstance,
that Bishop had murdered Morrison in the course of committing the
additional capital felony of armed robbery. OCGA § 17-10-30 (b) (2).
The trial court entered judgments of conviction and sentences on the
jury's guilty verdicts. Bishop's motion for new trial was denied and he
appeals.[1]

*General Grounds*

1. The evidence presented at trial authorized the jury to find the
following: Morrison drove Bishop and Bishop's co-indictee, Mark
Braxley, to a bar. Bishop and Braxley decided to steal Morrison's car.
The three left the bar around 11:00 p.m. and drove to Braxley's
trailer. Bishop reached into the sleeping Morrison's pocket for the car
keys, but Morrison awoke and sat up. Bishop began to beat Morrison
about the head and face with a blunt object. When Morrison was
unconscious, Bishop took the car keys. Eventually realizing that

---

[1] The crimes occurred on June 25, 1994 and the grand jury indicted Bishop on July 11,
1994. On August 9, 1995, the State filed its notice of intent to seek the death penalty. The
trial was held January 31-February 12, 1996. The jury returned its verdicts on February 12,
1996, and the trial court sentenced Bishop on February 12 and 13, 1996. Bishop filed a
motion for new trial on March 8, 1996, which motion the trial court denied on September 19,
1996. Bishop filed his notice of appeal on October 16, 1996, and the case was orally argued
on March 11, 1997.

Morrison was dead, Bishop and Braxley wrapped and then loaded the body into the back seat of Morrison's car. They drove to a dumpster which was located a short distance from Braxley's trailer. After unsuccessfully attempting to toss Morrison's body into the dumpster, Bishop and Braxley left the body on the ground where it was discovered several hours later. They drove Morrison's car into the nearby woods, set it on fire, and then walked back to Braxley's trailer to dispose of evidence of their crimes. After his arrest, Bishop made a statement in which he admitted delivering the blows with a wooden rod until Morrison stopped breathing, and described how he and Braxley disposed of the body and burned the car. Bishop subsequently confessed that, some two weeks prior to the murder of Morrison, he participated in the murder of Ricky Lee Wills and that he buried Wills' body in the woods near Braxley's trailer. After investigators recovered Wills' body, a grand jury indicted Bishop and Braxley for that murder as well. The trial court admitted evidence regarding Bishop's participation in Wills' murder in aggravation of punishment during the penalty phase of this trial for Morrison's murder.

The evidence is sufficient to enable any rational trier of fact to find proof of Bishop's guilt of malice murder and armed robbery beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). The evidence is also sufficient to authorize the jury to find Bishop's commission of armed robbery as an aggravating circumstance which supports his death sentence for the murder.

*Pre-trial Rulings*

2. Bishop urges that his inculpatory in-custody statement should not have been admitted because, as the result of antecedent drinking and smoking crack cocaine, he was unable to make a knowing waiver of his rights. Whether there was a knowing and voluntary waiver of rights depends upon the totality of the circumstances. *Reinhardt v. State*, 263 Ga. 113, 115 (3) (b) (428 SE2d 333) (1993). The record shows that Bishop read the *Miranda* warnings at the beginning of his statement and signed a waiver of rights form. He affirmed that he understood his rights, that he was aware of his surroundings, that his statement was voluntary and that he was not required to respond to the officers' questions. At the *Jackson-Denno* hearing, the officers who arrested and interviewed Bishop testified that he was coherent, that his answers were responsive to the questions and that he did not appear to be under the influence of drugs or alcohol. Under the totality of these circumstances, the trial court was authorized to find that Bishop knowingly waived his rights, despite his purported previous

consumption of alcohol and drugs. *Garcia v. State*, 267 Ga. 257, 258 (5) (477 SE2d 112) (1996); *Philmore v. State*, 263 Ga. 67, 68 (2) (428 SE2d 329) (1993); *Blackwell v. State*, 259 Ga. 810, 811 (2) (388 SE2d 515) (1990). The trial court's finding must be upheld, since it is not clearly erroneous. *Adams v. State*, 264 Ga. 71, 77 (10) (440 SE2d 639) (1994).

Bishop further contends that his statement was the inadmissible product of an unconstitutional warrantless arrest.

> "[A] 'warrantless arrest' is constitutionally valid if, at the moment the arrest is made, the facts and circumstances within the knowledge of the arresting officers and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the accused had committed or was committing an offense."

*Crowe v. State*, 265 Ga. 582, 586-587 (5) (458 SE2d 799) (1995). Prior to Bishop's arrest, the officers had the following reasonably trustworthy information: Morrison was last seen alive leaving the bar with Bishop and Braxley around 11:00 p.m. Although Bishop and Braxley claimed Morrison left the trailer in his car about 2:00 or 2:30 a.m., they were seen driving Morrison's car after 3:00 a.m. Morrison's body was found several hours later, less than a mile away from Braxley's trailer. These facts were sufficient to give the officers a particularized and objective basis for believing that Bishop murdered Morrison. *Dix v. State*, 267 Ga. 429, 431-432 (3) (479 SE2d 739) (1997).

3. Bishop argues that it was error to deny his ex parte motion for funds to hire an expert to assist him in his challenges to the arrays of the grand and traverse juries. The record indicates that the trial court did grant Bishop's request for funds to hire a "jury composition expert" and that Bishop made no further request for funds. Moreover, it does not appear that the services of an expert would have been needed to investigate a challenge to the arrays. See *Spivey v. State*, 253 Ga. 187, 199 (7) (a) (319 SE2d 420) (1984). Compare *Ake v. Oklahoma*, 470 U. S. 68 (105 SC 1087, 84 LE2d 53) (1985) (insanity defense). In any event, Bishop has not attempted to show that there is a reasonable probability that the assistance of a second expert to challenge the arrays was necessary to his defense and that, without such assistance, his trial was rendered unfair. *Isaacs v. State*, 259 Ga. 717, 725 (13) (c) (386 SE2d 316) (1989); *Roseboro v. State*, 258 Ga. 39, 41, fn. 3 (365 SE2d 115) (1988).

4. Bishop filed an unsuccessful challenge to the array of the grand jury based upon a prior history of alleged discrimination in the selection of forepersons and, on appeal, he urges that this challenge was meritorious. The trial court's denial of Bishop's motion does not

constitute error requiring reversal of his convictions and sentences, which were based upon verdicts returned by a properly constituted traverse jury. *Spivey v. State,* supra at 199 (7) (b). See also *Hobby v. United States,* 468 U. S. 339 (104 SC 3093, 82 LE2d 260) (1984).

## Jury Selection

5. Bishop urges that the trial court should have disqualified one of the prospective jurors, Ms. Baugh, because of her bias in favor of his guilt. Ms. Baugh initially expressed her belief that an indictee is more likely guilty than not. However, a prospective juror's expression of such a belief does not necessarily require disqualification from service. The relevant test is whether the prospective juror has formed an opinion on the guilt or innocence of the accused which is " ' "so fixed and definite that the juror will be unable to set the opinion aside and decide the case based upon the evidence or the court's charge upon the evidence." ' [Cits.]" *McClain v. State,* 267 Ga. 378, 380 (1) (a) (477 SE2d 814) (1996). Here, Ms. Baugh subsequently stated that she would hold the State to its burden of proof and that she would base her decision solely on the evidence adduced at trial. The trial court was not compelled to rely only upon Ms. Baugh's initial expression of a potentially disqualifying belief, rather than her subsequent qualifying answers. The trial court was authorized to resolve any equivocations and conflicts in Ms. Baugh's responses in favor of her qualification, and we must give deference to that resolution by the trial court. *Burgess v. State,* 264 Ga. 777, 780 (6) (450 SE2d 680) (1994); *Ledford v. State,* 264 Ga. 60, 64 (6) (439 SE2d 917) (1994).

6. Citing *Pope v. State,* 256 Ga. 195, 201 (7) (e) (345 SE2d 831) (1986) as controlling authority, Bishop contends that the trial court should have disqualified Ms. Baugh and four other prospective jurors based upon their bias in favor of the death penalty. In *Pope v. State,* supra at 201 (7) (e), the prospective juror did not equivocate, but unwaveringly maintained that, if the defendant were found guilty and the trial court authorized consideration of the death penalty, he would "listen" to the mitigating evidence, "but it would not change his opinion." Bishop submits that the five prospective jurors in this case likewise expressed such a disqualifying bias.

## Ms. Baugh

Ms. Baugh stated she would probably vote for death in cases of "premeditated" murder. However, this response does not require disqualification, since "premeditated" murder is not a crime in Georgia, and premeditation is not an aggravating circumstance which would affect the jury's sentencing determination pursuant to OCGA § 17-

10-30. Moreover, Ms. Baugh volunteered that she could vote to impose a sentence of life without parole even in cases of "premeditated" murder. Unlike in *Pope*, the entirety of Ms. Baugh's voir dire does not demand a finding that she expressed an unqualified and unequivocal bias in favor of the death penalty. The trial court was authorized to base its finding on those portions of Ms. Baugh's voir dire which demonstrated her qualification for service. *Mobley v. State*, 265 Ga. 292, 295 (7) (455 SE2d 61) (1995).

### Mr. Langston

Mr. Langston initially stated that he would always vote for the death penalty. However, once the nature of a bifurcated trial was explained to him, Mr. Langston said he could listen with an open mind to all of the evidence. He specifically stated that he could vote for any of the three sentencing options, even where there was an aggravating circumstance. Mr. Langston did subsequently state his belief that murder "deserved" the death penalty. However, such a personal belief would not disqualify Mr. Langston, unless it would prevent or substantially impair him from performing his duties as a juror in accordance with his instructions and his oath. *Greene v. State*, 268 Ga. 47 (485 SE2d 741) (1997). The trial court was authorized to believe Mr. Langston when he testified that he would listen to all of the evidence and that he could vote for any of the three possible sentencing options. Because Mr. Langston expressed qualifying beliefs which the trial court accepted, the refusal to strike him for cause must be upheld on appeal. Compare *Pope v. State*, supra.

### Mr. Williamson

Mr. Williamson did state that he had "pretty much made up his mind" to vote for the death penalty, assuming there was a finding of a statutory aggravating circumstance. However, Mr. Williamson's other responses indicated that he certainly had not done so conclusively and irrevocably. He stated that he would listen to the evidence in aggravation and mitigation before arriving at a sentence and that he could vote for any of the three sentencing options, although he favored the death penalty in most cases of murder. Viewed in its entirety, Mr. Williamson's voir dire is clearly distinguishable from that of the prospective juror in *Pope v. State*, supra. Mr. Williamson stated that he would not decide punishment until he had heard all of the evidence. Although Mr. Williamson personally favored the death penalty as punishment for murder, he declined to rule out voting for a life sentence. His voir dire may contain seemingly contradictory responses, but prospective jurors' answers frequently will be somewhat contradictory "in response to the phrasing of the questions, the

manner in which the questions were asked, and the distinctions which they asked the jurors to draw." *Ledford v. State*, supra at 63 (6). An appellate court will defer to the trial court's resolution of any equivocations and conflicts in the prospective jurors' responses on voir dire. *Greene v. State*, supra; *Burgess v. State*, supra at 780 (6); *Ledford v. State*, supra at 64 (6). Considering the entirety of Mr. Williamson's voir dire, the trial court was authorized to find him qualified to serve. Compare *Pope v. State*, supra.

### Mr. Hurt

Mr. Hurt stated that he was inclined to vote for the death penalty for the more culpable forms of murder and that he personally believed in "an eye for an eye." However, he also consistently indicated that he could vote for any of the three sentencing options. Although Mr. Hurt stated he would be more likely to impose the death penalty if the killing was "senseless" and there was "intent to kill," his leaning toward a death sentence under specific circumstances does not necessarily mandate his disqualification. See *Crowe v. State*, supra at 588 (9) (a). Consideration of the entirety of Mr. Hurt's voir dire authorized the trial court to find that he would set aside any personal beliefs and that he was, therefore, qualified to serve as a juror. Compare *Pope v. State*, supra.

### Ms. Lattimore

Ms. Lattimore initially stated that she did not think that she could vote for a life sentence with the possibility of parole once the defendant had been convicted and there was a finding of a statutory aggravating circumstance. However, she later qualified her response, stating that she was unsure as to how she would vote in that situation and would have to consider all of the evidence. Ms. Lattimore also stated that she could not say she would always vote for the death penalty. It is not decisive that some of Ms. Lattimore's responses, if considered in isolation, could be construed as disqualifying. Ms. Lattimore's voir dire also contains qualifying responses and the trial court, having heard all of Ms. Lattimore's responses, concluded that she was qualified. This is in contrast to the prospective juror in *Pope*, who categorically and unequivocally stated that mitigating evidence would not change his mind. Although Ms. Lattimore may personally have favored the death penalty for murder, she repeatedly responded that there could be situations in which she would vote for another sentence. Based upon a review of all of Ms. Lattimore's voir dire, we find that it supports the trial court's determination that she was qualified to serve.

7. Bishop urges that he should have been allowed to ask prospec-

tive jurors whether they would be more likely to vote for death if the defendant was under the influence of drugs at the time of the crimes. The trial court did not abuse its discretion in refusing to allow Bishop to ask this question, as it called for a prejudgment of the sentence. See *Hittson v. State*, 264 Ga. 682, 686 (6) (d) (449 SE2d 586) (1994); *Lee v. State*, 258 Ga. 762, 763 (5) (374 SE2d 199) (1988). The trial court did not prohibit Bishop from engaging in relevant voir dire, such as by asking the prospective jurors whether they would consider drug use a mitigating factor. See *Lee v. State*, supra at 763 (5).

Bishop further contends that the trial court erred by preventing him from exploring the prospective jurors' attitudes with regard to the various forms of murder, such as "premeditated" murder. However, there is no such offense in Georgia and, therefore, it was not improper to curtail questioning in that regard. *Ledford v. State*, supra at 63 (5).

8. The trial court's pre-voir dire charge included an instruction on the sentence of life without parole, which informed the prospective jurors, in accordance with OCGA § 17-10-31.1 (d) (1), that such a sentence would result in incarceration for the remainder of the defendant's natural life and his ineligibility for parole, "unless he is subsequently adjudicated to be innocent of the offense for which he was sentenced." Bishop urges that the inclusion of this qualifying phrase may have misled the prospective jurors into believing that there was a potential "loophole" in the life-without-parole sentence and that this may then have caused them to reject imposition of that sentence.

The qualifying phrase is a part of the statutory language applicable to a life-without-parole sentence, and this Court recently held that such an instruction is not misleading. *Henry v. State*, 265 Ga. 732, 741 (10) (c) (462 SE2d 737) (1995).

9. Prospective jurors who arrived late were allowed to read the trial court's pre-voir dire charge and, on appeal, Bishop contends that this was error. Whether to give pre-voir dire instructions is within the discretion of the trial court. *Frazier v. State*, 257 Ga. 690, 695 (10) (362 SE2d 351) (1987). If, however, the trial court determines to give a pre-voir dire charge, the better practice certainly is to do so in accordance with the established procedure and formality applicable to the giving of the jury charge at the conclusion of the guilt-innocence phase. Therefore, we do not approve of the trial court's inconsistent treatment of its pre-voir dire charge in this case by permitting some of the prospective jurors merely to read its charge. However, Bishop has shown no prejudice resulting from the trial court's actions. Whether they heard or read the trial court's pre-voir dire charge, the prospective jurors thereafter were subjected to a thorough and extensive voir dire to determine their qualifications to serve as jurors. At the guilt-innocence and sentencing phases of the

trial, the trial court followed proper procedure and gave oral instructions to the entire jury. Accordingly, there is no reasonable probability that the procedure utilized by the trial court in the delivery of its pre-voir dire charge resulted in any harm to Bishop. See generally *Griffin v. State*, 265 Ga. 552, 554 (6) (458 SE2d 813) (1995).

## *Guilt-Innocence Phase*

10. Because the sheriff was a State's witness, the trial court sustained Bishop's objection to the sheriff's acting as bailiff. Although Bishop raised no other objection in the trial court, he asserts on appeal that the trial court erred by allowing the sheriff and chief deputy, who also testified for the State at trial, to perform certain ministerial functions on behalf of the court.

Court decisions do condemn allowing law enforcement officers who give key testimony for the State to be " 'charged with the care and protection of the jurors.' [Cit.]" *Radford v. State*, 263 Ga. 47, 49 (6) (426 SE2d 868) (1993). However, contact between the jury and a witness for the State who is also an officer of the court is not grounds for an automatic reversal. *Radford,* supra at 48 (1). The factors to be considered are the type and duration of the contact and the significance of the testimony. A "brief encounter" is insufficient to demonstrate a constitutional violation. *Radford*, supra at 48 (1). Here, the sheriff and chief deputy had no personal contact with the jurors. The only official contact occurred during the brief period when the sheriff acted as bailiff. That contact ended promptly upon Bishop's objection and he raised no further objection to contact with the jurors. Although we do not approve of the officer-witnesses' performance of any court-related functions in connection with this case, there was no extensive contact with the jurors and, under these circumstances, we find no reversible error.

11. Bishop urges that, in the opening statement to the jury, counsel for the State erroneously alluded to a felony murder theory, even though the indictment charged only malice murder. A review of the relevant portion of the transcript shows that counsel merely asserted that, even if Bishop did not inflict the fatal blow, he was still guilty of Morrison's murder. This does not allude to a felony murder theory, but only to Bishop's guilt for malice murder under a party-to-the-crime theory. Moreover, even if the contested statement could be construed as a reference to a felony murder theory, Bishop was on notice that he could be convicted of felony murder, because he was indicted for both murder and armed robbery. See *McCrary v. State*, 252 Ga. 521, 524 (314 SE2d 662) (1984).

12. In his opening statement, the prosecuting attorney also referred to Bishop as the "main one" or "prime mover" in the crimes.

Bishop contends that the State subsequently produced no evidence to support this characterization of him. In his statement, however, Bishop admitted that it was he who attempted to steal Morrison's car keys and who instigated the beating by administering the first crushing blows, after which Morrison ceased breathing. In the same statement, Bishop admitted stealing Morrison's keys after the beating and suggesting to Braxley that they dispose of the body. The singed hair on his hands indicated that Bishop set fire to Morrison's car to destroy evidence of the crimes. Given this evidence of Bishop's level of participation in the crimes, we do not find counsel's characterization of him to be improper. See *Carr v. State*, 267 Ga. 547, 558 (8) (b) (480 SE2d 583) (1997).

13. Over Bishop's objection, the trial court admitted into evidence numerous photographs of Morrison's body. None of the photographs depicted an alteration of the body as proscribed in *Brown v. State*, 250 Ga. 862, 866 (5) (302 SE2d 347) (1983). *Bullard v. State*, 263 Ga. 682, 686 (5) (436 SE2d 647) (1993). Notwithstanding their gruesomeness, photographs of a murder victim's body are admissible if they illustrate the nature and location of the wounds. *Sorrells v. State*, 267 Ga. 236, 239 (3) (476 SE2d 571) (1996). Here, the gruesome or inflammatory nature of the wounds depicted in the photographs "stemmed entirely" from the criminal conduct of Bishop. *Berry v. State*, 267 Ga. 605, 612 (10) (481 SE2d 203) (1997). The number of photographs admitted reflects the fact that Morrison was savagely beaten, and that he sustained numerous wounds. See *Conklin v. State*, 254 Ga. 558, 573 (11) (b) (331 SE2d 532) (1985). The trial court examined each photograph and heard argument prior to admitting them into evidence. We find no error in the trial court's evidentiary ruling.

14. It is urged that, in his closing argument, counsel for the State erroneously asserted a personal belief in Bishop's guilt. Bishop failed to object to any portion of the closing argument. Accordingly, reversal is warranted only if there was improper argument *and* it is reasonably probable that such argument changed the result of the trial. *Todd v. State*, 261 Ga. 766, 767 (2) (a) (410 SE2d 725) (1991).

Counsel has wide latitude to argue inferences from the evidence. *McClain v. State*, supra at 384 (3) (b) (2). Here, the attorney for the State made several comments similar to the following: "[A]nyway you . . . look at it, he's guilty." Considered in context, these comments are no more than an expression of the State's position, and are not the personal opinion of its counsel, regarding Bishop's guilt.

The State's counsel also made comments, such as: "[W]e're not going to bring something to court unless we can prove it and if we can't prove this is the murder weapon, we ain't going to produce it to you." These remarks appear to be only a reference to the fact that no

murder weapon had been recovered. Therefore, these comments represent a proper attempt by the prosecuting attorney to account for the absence of any tangible evidence of the instrument which inflicted the fatal blows. Such remarks would not invoke " 'the prosecutorial mantle of authority' " with regard to Bishop's guilt. *McClain v. State*, supra at 384 (3) (b) (2). Moreover, to the extent that the remarks could be construed as improper, there is no reasonable likelihood that the result of the trial was changed thereby, given the overwhelming evidence of Bishop's guilt. *Wyatt v. State*, 267 Ga. 860, 865 (2) (b) (485 SE2d 470) (1997).

### Sentencing Phase

15. Evidence that Bishop had made prior threats and assaults on others was relevant to his character and was, therefore, admissible in aggravation of his sentence. *Ford v. State*, 257 Ga. 461, 463 (1) (360 SE2d 258) (1987).

16. Bishop enumerates as error the admission of evidence that he murdered Wills. In aggravation of the sentence, the State may prove the defendant's commission of another crime, "despite the lack of a conviction, so long as there has not been a previous acquittal." *Jefferson v. State*, 256 Ga. 821, 827 (8) (b) (353 SE2d 468) (1987). Evidence of Bishop's murder of Wills was admissible in aggravation even though it did not pertain to a specific statutory aggravating circumstance. *Hicks v. State*, 256 Ga. 715, 727 (19) (352 SE2d 762) (1987). In determining the sentence, the jury may take into consideration " '[a]ny lawful evidence which tends to show the motive of the defendant, his lack of remorse, his general moral character, and his predisposition to commit other crimes. . . .' [Cits.]" *Devier v. State*, 253 Ga. 604, 619 (9) (323 SE2d 150) (1984). In the absence of a proper request, the trial court is not required to instruct the jury on the standard of proof applicable to evidence of the defendant's commission of such other crimes. See *Freeman v. State*, 268 Ga. 185 (486 SE2d 348) (1997).

Bishop contends that the evidence admitted in connection with the murder of Wills was excessive. However, the State is not limited to showing that the defendant has been charged with another offense. We find no error in the quantum of the evidence admitted in connection with Bishop's murder of Wills.

17. Photographs of Wills' body were admissible in the sentencing phase for the same reasons that the photographs of Morrison's corpse were admissible in the guilt-innocence phase. See Division 13.

18. In its charge at the sentencing phase, the trial court was not required to define or explain the function of mitigating circumstances. *Ross v. State*, 254 Ga. 22, 31 (6) (326 SE2d 194) (1985). More-

over, it was not necessary that the trial court identify the mitigating circumstances offered by Bishop. *Davis v. State*, 255 Ga. 598, 612 (22) (340 SE2d 869) (1986).

## *Death Penalty Review*

19. As discussed in Division 1 of this opinion, the evidence supports the jury's finding that Bishop murdered Morrison while committing the additional capital felony of armed robbery. OCGA § 17-10-30 (b) (2).

20. Bishop urges that, because he suffers from "Intermittent Explosive Disorder" which is triggered and aggravated by alcohol and drugs, he lacks the personal culpability that is constitutionally required for imposition of the death penalty. However, Bishop acknowledges that he is not mentally ill and the psychiatrist who testified for Bishop at the sentencing phase did not find him to be mentally ill as defined by OCGA § 17-7-131 (a) (2). It was for the jury to decide whether Bishop's mental health and history of alcohol and drug abuse were sufficiently mitigating so as to justify a life sentence. *Carr v. State*, supra at 558 (8) (b).

21. Bishop's death sentence was not imposed under the influence of passion, prejudice or other arbitrary factor. OCGA § 17-10-35 (c) (1). The death sentence is neither excessive nor disproportionate to penalties imposed in similar cases, considering both the crime and the defendant. Bishop's argument that his sentence is disproportionate to the life sentence received by Braxley is without merit. *Carr v. State*, supra at 559 (11). Nor do we find that the death sentence is rendered inappropriate by virtue of Bishop's history of alleged abuse. *Hittson v. State*, supra at 688 (8). The similar cases listed in the Appendix support the imposition of the death sentence in this case.

*Judgments affirmed. All the Justices concur, except Benham, C. J., and Sears, J., who concur in the judgment and in all Divisions except Division 6 and Fletcher, P. J., who concurs specially.*

## APPENDIX.

*Greene v. State*, 266 Ga. 439 (469 SE2d 129) (1996), rev'd on other grounds, 519 U. S. ___ (117 SC 578, 136 LE2d 507) (1996); *Mobley v. State*, 265 Ga. 292 (455 SE2d 61) (1995); *Meders v. State*, 261 Ga. 806 (411 SE2d 491) (1992); *Kinsman v. State*, 259 Ga. 89 (376 SE2d 845) (1989); *Jefferson v. State*, 256 Ga. 821 (353 SE2d 468) (1987); *Davis v. State*, 255 Ga. 588 (340 SE2d 862) (1986); *Smith v. State*, 249 Ga. 228 (290 SE2d 43) (1982); *Cunningham v. State*, 248 Ga. 558 (284 SE2d 390) (1981); *Dick v. State*, 246 Ga. 697 (273 SE2d 124) (1980).

FLETCHER, Presiding Justice, concurring specially.

This Court in Division 8 approves a jury instruction on the sentence of life without parole because it "is a part of the statutory language" of OCGA § 17-10-31.1 (d). The fact that a jury instruction is taken directly from a statute does not automatically qualify it as an appropriate jury instruction.[2] Because part of the statutory language is both misleading and unnecessary as a jury instruction, it should not be charged to the jury.

The trial judge instructed the jury prior to voir dire concerning the three possible punishments — death, imprisonment for life without parole, or life imprisonment. On the second option, the trial court stated:

> The second punishment, life without parole, means that the defendant shall be incarcerated for the remainder of his natural life and shall not be eligible for parole unless he is subsequently adjudicated to be innocent of the offense for which he was sentenced.

This instruction is taken directly from OCGA § 17-10-31.1 (d) (1), which grants authority to the trial court to give the instruction during the sentencing phase of trial.

Although the statute is good law, the phrase "unless he is subsequently adjudicated to be innocent of the offense for which he was sentenced" causes problems when used in a jury instruction. This phrase misleads the jury by suggesting that a person sentenced to life without parole may be eligible for parole. If, however, a court or the State Board of Pardons and Paroles determines that a person is innocent of the crime for which he was convicted, then the proper procedure would be to vacate the sentence or grant a pardon. Moreover, the phrase is not necessary to inform the jury about the meaning of life without parole. Life without parole, as the first part of the statute states, "means that the defendant shall be incarcerated for the remainder of his natural life and shall not be eligible for parole." No more explanation is needed; none should be given.

Because the majority opinion blindly adheres to the rule that any statute, no matter how confusing, is a valid basis for a jury charge, I concur specially to Division 8. Although trial courts should not give the offending phrase in the future as part of their jury

---

[2] See *Ford v. Uniroyal Goodrich Tire Co.*, 267 Ga. 226 (476 SE2d 565) (1996) (concluding that trial court should not have given jury instruction based on 75 percent allocation rule in OCGA § 51-12-5.1 (e)); cf. *Smith v. State*, 268 Ga. 196 (486 SE2d 819) (1997) (Carley, J., dissenting) (discussing why language taken directly from appellate court opinions is inappropriate as a jury instruction).

instruction, I conclude that there was no reversible error based on the charge in this case. In addition, I concur in judgment only to Division 6 of the majority opinion.

DECIDED JULY 16, 1997 —
RECONSIDERATION DENIED JULY 30, 1997.

*Brian G. Combs, Reginald L. Bellury,* for appellant.
*Fredric D. Bright, District Attorney, Thurbert E. Baker, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Wesley S. Horney, Assistant Attorney General,* for appellee.

