## A01A1587. HILL v. THE STATE.
(553 SE2d 289)

ELDRIDGE, Judge.

A DeKalb County jury found Mark Anthony Hill guilty of rape, kidnapping with bodily injury, aggravated sodomy, and armed robbery (motor vehicle). He appeals and, in six enumerations of error, challenges the admissibility of taped statements given to the police and the sufficiency of the evidence to support his conviction. Upon review of the errors as enumerated, we affirm.

A thorough review of the taped statements put before the jury, as well as the trial testimony introduced, is necessary for resolution of the specific issues raised on appeal. To that end and in a light most favorable to upholding the jury's verdict,[1] the evidence of record shows that, at approximately 8:30 p.m. on Friday, March 3, 2000, while on her way to her daughter's house, the victim stopped at the Chevron gas station at the corner of Oak Grove and Lavista Roads. The victim testified at trial that she briefly went into the station in order to pay for the gas she had just pumped. While she was inside, appellant Hill entered the victim's red Plymouth Voyager minivan — which she had left unlocked — and went through her purse; he hid in the back of the van as the victim approached. When the victim got into the van, she put the keys in the ignition and then noticed that the contents of her purse were strewn across the passenger seat. The victim testified that, at that time, Hill came from behind her and held a steak knife to her throat. He grabbed the victim's wrist, and

---

[12] *BMH Real Estate Partnership v. Montgomery*, 246 Ga. App. 301, 302 (1) (540 SE2d 256) (2000).

[1] *Jowers v. State*, 244 Ga. App. 292, 293 (1) (535 SE2d 294) (2000).

"He started pulling me out of my seat and trying to push me over. And I was screaming and I was crying, and he was telling me to shut up. And he was trying to push me into the passenger's seat and eventually did." Hill got into the driver's seat. He made the victim put her hands over her face, "[a]nd he proceeded to drive out of the service station." While Hill was driving down Lavista, the victim testified that he "took me by the back of the neck and pushed me between the seats to where my face was in the backseat." The victim suffered a neck injury from Hill's actions.

Eventually the van came to a stop, and Hill got out. He told the victim "to stay down and to stay quiet because there were people that were watching [her]." Hill returned a few minutes later, and the victim testified that she heard a cigarette lighter, explaining, "I don't know what he was doing, maybe smoking his crack or whatever, you know." Then the van backed up: "it seemed like we were going in reverse." When the van stopped, Hill ordered the victim to "turn around and suck this." The victim testified, "that's when he held the knife to my throat and forced my head to his penis." Thereafter, the victim stated Hill "pushed me away and told me to pull my pants down." Hill had forcible sexual intercourse with the victim.

Thereafter, Hill "started to drive"; the victim testified that "he pulled me up into the seat. And he just drove continuously around in a circle." During this time, Hill prepared a crack pipe and smoked it. He told the victim to smoke the pipe: "And I told him, 'No, I don't smoke crack,' you know. And so then he forced me to; he told me to take it." Hill and the victim drove for approximately 20 minutes smoking crack. Eventually, Hill pulled into the driveway of a house on Valley Brook Drive in DeKalb County belonging to a man named "George." Hill got out of the vehicle; when he returned, Hill and the victim followed a white van to a location off Hollywood Drive in DeKalb County. Hill again left the vehicle. The victim stated that he removed the keys each time he left the minivan. After Hill returned, he and the victim followed the white van back to George's house on Valley Brook Drive. When they arrived, the victim testified that "[t]his other guy came up, and he [Hill] went to the back of the van and talked to him. And then the guy came up to the window on the driver's side and looked in and said, 'Hi, I'm Fats.'" Fats asked the victim if she would give him a ride "down the road somewhere." The victim agreed, and Hill said he would drive. "He cranked the van and proceeded to drive. And Fats, the Fats guy started talking to me and asking me if we could go out, if we could get together and all this stuff. And I was like, 'No. I'm on my way to my daughter's. He knows I have to go to my daughter's.' And then we drove to different places where they tried to purchase crack."

Hill, Fats, and the victim drove to "six or seven, maybe more"

places in the "Scottdale, Decatur area." The victim testified that, while they were driving, Fats smoked a cigarette laced with crack. He passed it to Hill, who thereafter handed it to the victim; she testified, "I said, 'No,' and he shoved it to me, and he gave me this evil look and I took it."

Hill, Fats, and the victim drove around the Scottdale/Decatur area "maybe two hours." Eventually, they returned to George's house, where Hill told the victim "to come in for a few minutes." The victim stated, "So I got out of the van, and I started to walk in, between the two of them." There were several people in the house, and "[a]ll of them had their own little glass thing, and they were smoking crack. There was a thing of crack laying on the table. I mean there was a lot of stuff laying there." The victim sat down; she testified that she refused an offer of more crack, but asked for "some of that joint [marijuana] over there." The victim testified that "I wanted to look like I was — I was playing a part; I was having to be his friend."

After she smoked, Hill called her into another room. The victim testified that "I got up and I walked in there, and he grabbed my arm again and told me I was going to have to have sex with the Fats guy. And I started crying and begging to leave." The victim stated that Hill "told me to shut up or he was going to torch me in my van." The victim testified that she went to the bathroom and, thereafter, "I opened the door and I started screaming, 'Please help me. He's abducted me and he's raped me.' " The victim decided to make outcry "because I didn't want to have sex with anybody. I didn't want to be taken advantage of anymore." After making outcry, the victim testified that "the Fats guy started talking to me and asking me what was happening. And I was like, 'Look, I want to go home. Get my keys.' And they, then, they proceeded to make him [Fats] go out there and get my keys." The victim left in her minivan and drove to her daughter's house.

The police were contacted, and the victim went to the hospital where a rape kit was done at approximately 1:00 a.m. on March 4, 2000 — about four hours after the rape which the victim reported as occurring at 9:00 p.m. the prior evening, March 3. The rape kit tested positive for sperm, although the sperm sample was "probably a day to a day and a half old when taken," i.e., the sexual act had occurred approximately 24 to 36 hours from the time the rape kit was done. A subsequent DNA test on the sperm sample matched the DNA from a blood sample taken from Hill.

Pursuant to investigation, Fats, a/k/a Morrell Dorsey gave a taped statement to the police. In his statement, Dorsey confirmed that he first saw Hill and the victim together in the victim's red minivan. Thereafter, he asked Hill if he could get a ride to the store from the Valley Brook residence belonging to his employer, George,

and Hill said, "let me ask my friend if I can run you to the store." According to Dorsey, Hill asked the victim if he could take Dorsey to the store, and the victim personally told Dorsey "come on" and motioned for him to get into the van. Dorsey confirmed that the threesome drove through the Scottdale/Decatur area, but claimed that only Hill and the victim were looking for drugs. He maintained that he never smoked crack, but only drank beer. Dorsey stated that, the whole time, Hill and the victim were "talking to each other like they knowed each other"; that from their behavior, he thought "they were together." Dorsey stated that the victim was acting "normal," and "relaxed"; that "she was not tensed up or nothing."

When they returned to George's house, the victim told Hill, "I can come in for a few minutes." Dorsey stated that the victim introduced herself to everyone when she walked in the house and shook hands with George, the owner; Dorsey stated that the victim was sitting "calm and cool" at the table in the house, "getting acquainted" with everyone. He stated that Hill called the victim over to the bathroom for a minute and, when she returned, she sat back down at the table. Dorsey stated that thereafter Hill came by and wanted to leave, asking, "Let's go baby. Ready to go?" He claimed that when Hill took her arm to go, the victim "bust out crying." It was then the victim told the men at the table that Hill had "snuck into her van" at the "Texaco or Amoco" and "put a knife to my throat" and raped her. Dorsey stated that she begged them to help get her keys back from Hill. Dorsey stated that he was "shocked" by this news. Hill and he had grown up in the same area, and Dorsey "never knew him to do anything like that." Hill had gone outside during the victim's outcry. Dorsey followed him outside, and when confronted by Dorsey with the victim's story, Hill "said fuck that shit or something like that. He was cursing." Dorsey stated that Hill gave the victim's keys back after Dorsey paid him $20 to do so.

Appellant Hill also gave a taped statement to the police. In it, he claimed that he knew the victim because he is an infrequent patron of the Tattletales lounge, where the victim is a waitress. He stated that the victim was with Dorsey on the Friday night in question and that the victim and Dorsey picked him up in order to buy crack cocaine. All three went to George's house on Valley Brook Drive, and all three smoked crack cocaine there. Hill stated that the victim allowed him to borrow her minivan in order to buy more drugs from dealers in the Scottdale area. Hill stated that he gave the victim crack cocaine in order to use the van. Hill stated that, when he returned to George's house, he came back with a girl named "Vicky"; that the victim got upset; and that she was "screaming and yelling." He stated that he gave the victim's car keys to Fats when asked, because it was time to go; that people were "raising hell"; and that

"you can't get high with a bunch of conflict." Hill stated that he knew what the victim had accused him of, but "don't know where the accusation came from." Hill denied having sex with the victim.

At trial, the State called Dorsey to the stand. After answering a few initial questions, including that he first saw the victim when she and Hill drove up in the victim's van to "where I was at," Dorsey asked, "Excuse me, do I got to answer these questions? . . . I mean I ain't had a chance to talk with nobody thoroughly." When told that he was required to answer the questions, Dorsey could not remember anything further about either the night in question or what he had said in his statement to the police: "I mean I need a chance to talk to somebody, you know." No transcript of Dorsey's taped statement had been prepared, and thus Dorsey's memory could not be refreshed therefrom. After the prosecutor attempted unsuccessfully to elicit further testimony from Dorsey, the trial court stated, "He is not going to remember anything. We are just wasting our time with this, aren't we? He is not going to testify. He is not going to remember." Later, over a hearsay objection, the trial court permitted the State to play Dorsey's taped statement as a prior inconsistent statement.

Hill took the stand and testified on his own behalf. He testified that he knew the victim from the Tattletales lounge, but had not seen her for over a year. He testified that he saw her again for the first time when he went to George's house on the day before the incident date, i.e., Thursday, March 2, 2000. The victim was already at George's house smoking crack cocaine. Hill testified that he started making small talk with her because he wanted to get the victim "to go in the back room." He asked the victim "did she want some crack, to go have sex in the back room." The victim agreed. Hill testified that he and the victim spent approximately an hour and a half together smoking crack and that he spent "[a]ll the money I had so, you know, I probably had about $75 or whatever."

Hill testified that he returned to George's house the next night, the night in question March 3, 2000. The victim arrived five minutes later. Hill stated that the victim, and Dorsey, and he left in the victim's van to buy drugs in the Scottdale area. He testified that everyone in the car was smoking crack cocaine. When they all returned to George's house, the victim went inside and "sat there at the table and smoked crack." Hill claimed that he gave the victim a "dime" bag of crack in order to borrow her minivan; that he borrowed the victim's van; and that thereafter he returned to George's house with a "neighborhood junky" named "Vicky" and went into the back bedroom with her to have sex for drugs. Hill claimed that while he was in the bedroom with Vicky, the victim got upset; Hill testified that "I guess she [victim] got mad because she couldn't get no more dope, and then she went in a little panic, rage, you know." He testified, "[a]nd all of a

sudden she jumped up and said something; I don't know what. I wasn't at the table, so I couldn't tell you what she said. The only thing, they came back and told me that she out here acting crazy."

Hill stated that he went out to the table to "see what was going on"; that he "heard the accusations"; and that he knew the victim accused him of raping her, but he was not worried "because I know everything she said is not true, so." Hill testified that "I thought she [victim] just said that [rape] just to get some dope"; he claimed that the victim cried rape "[b]ecause everybody would have felt sorry for her, so she could get some cocaine." *Held*:

1. In his first three enumerations of error, Hill contends the trial court erred in admitting the taped statement of Dorsey as a prior inconsistent statement since Dorsey did not deny the facts contained therein, but simply did not "remember" them. Thus, Hill contends, the taped statement was inadmissible as hearsay. We agree that the statement was not admissible as a prior inconsistent statement, but we conclude that its admission was harmless.

"[W]here a witness merely states that he does not remember, he cannot be impeached by the showing of former statements with respect to the facts which he claims not to remember."[2] This is true regardless of whether the witness' failure to "remember" is real or contrived, as it appeared to be in this case. Here, a transcript of Dorsey's taped statement should have been prepared and used to refresh his memory, thereby giving him a chance to either admit or deny making his statements.[3] The tape's admission would then be based on the answers received from a recollection refreshed, no matter how reluctantly so. As this was not done, Dorsey's taped statement was neither inconsistent nor consistent with his otherwise nonexistent trial testimony, and its admission as a prior inconsistent statement was error.

However, "[t]he erroneous admission of hearsay is harmless where, as here, legally admissible evidence of the same fact is introduced."[4] In this case, Dorsey's statement added nothing to the information already before the jury through the testimony of both Hill and the victim.[5]

The allegations contained in Dorsey's taped statement of a rape at knifepoint that occurred earlier in the evening at a "Texaco or Amoco" came solely from the victim, and Dorsey had no personal

---

[2] (Punctuation omitted.) *Johnson v. State*, 255 Ga. 552, 556 (4) (a) (341 SE2d 220) (1986).

[3] *Bischoff v. Payne*, 239 Ga. App. 824, 826 (522 SE2d 257) (1999); *Brown v. State*, 266 Ga. 633, 635 (469 SE2d 186) (1996).

[4] *Felder v. State*, 270 Ga. 641, 646 (8) (514 SE2d 416) (1999).

[5] See *Moore v. State*, 245 Ga. App. 641, 644 (2) (537 SE2d 764) (2000); *Assad v. State*, 195 Ga. App. 692, 693 (2) (394 SE2d 617) (1990).

knowledge of a rape. In that regard, the victim testified at trial she told Dorsey that Hill had raped her at knifepoint earlier at a "Chevron" station. Appellant Hill, himself, acknowledged in his statement to the police that the victim accused him of forcible rape on the night in question; that the victim was "yelling and screaming"; and that he left George's house because "you can't get high with a bunch of conflict." Indeed, Hill testified at trial that, at George's house on the night in question, the victim accused him of rape, but he was "not worried" because he knew the accusation was false. Thus, it is undisputed that an *allegation* of an earlier forcible rape was made by the victim at George's house on the night in question. Such provided no issue for the jury to decide. And Dorsey's statement simply repeated the undisputed fact that a rape allegation was made by the victim.

The only issue for the jury was the *credibility* of the allegation of the prior forcible rape, which by extension included the credibility of the victim's explanation about her continued presence with Hill after the rape, both in her vehicle and at George's house. We find that, as a matter of fact, Dorsey's taped statement did not impact on this credibility issue to the detriment of Hill. In fact, Dorsey's statement — on its face — was more of an aid to the defense in terms of the victim's credibility.

Dorsey testified that, during the time he was with Hill and the victim, the victim's behavior was "normal"; that she was calm, cool, relaxed, and friendly; that at no time did she act "tense"; that, the whole time they were together, she and Hill acted like they "knowed each other"; that, from their conduct, Dorsey thought "they were together"; that the victim *wanted* to enter George's house "for a few minutes"; that the victim shook hands with George when she entered his house and sat at the table with everyone else "getting acquainted"; that the victim smoked marijuana while at the table; that Dorsey was "shocked" at the sudden allegations of rape because he had known Hill since childhood and had never known him to do anything like that. Thus, there was nothing about Dorsey's statement that would lend credibility to the victim's contention that the entire time she was with Dorsey, she was the kidnapped victim of an earlier forcible rape at the hands of Hill.

Before this Court, Hill contends that the error in the admission of Dorsey's statement was harmful because Dorsey "was the only other witness to testify as to the interaction between the Appellant and [the victim]." However, as discussed, Dorsey's taped statement about the personal interaction between Hill and the victim was completely exculpatory to Hill. "A party seeking a reversal must show not

only error, but injury arising from the error alleged."[6]

Moreover, Dorsey's taped statement factually contradicted the victim in several key aspects: he stated that the victim told him the rape occurred *at* the "Texaco or Amoco" gas station — as opposed to the victim's testimony that Hill drove her from a Chevron station to another location and raped her; Dorsey stated that he never made a sexual overture to the victim — as opposed to the victim's testimony that Dorsey asked, "if we could go out, if we could get together and all this stuff"; Dorsey stated that he never used drugs and was not driving around smoking crack with Hill and the victim — as opposed to the victim's testimony that the threesome drove around the Scottdale area and purchased crack cocaine which Dorsey mixed with cigarette tobacco and smoked; Dorsey stated that it was the victim's idea to go into George's house — as opposed to the victim's testimony that Hill required her to go inside; Dorsey stated that the victim made her outcry suddenly at the table in response to Hill's request to leave the house, "Let's go baby," — as opposed to the victim's testimony that her outcry was made from the bathroom after Hill told her that she must have sex with Dorsey in the bedroom of the house. Thus, Dorsey's taped statement could be seen as impeaching with regard to the testimony of the victim and did not serve to bolster her credibility.

In sum, the taped statement of Dorsey was cumulative of evidence from both Hill and the victim regarding the undisputed fact that, while at George's house on the night in question, the victim accused Hill of an earlier forcible rape, a fact about which Dorsey had no personal knowledge.[7] Further, the portions of Dorsey's taped statement about which he had personal knowledge did not prejudice Hill with regard to the credibility of the victim's allegations, since Dorsey's statement factually contradicted the victim's testimony in several key respects, and in many other respects — including the personal interaction between Hill and the victim — factually corroborated Hill's defense that the victim was with him voluntarily/consensually. Accordingly, any error in the admission of Dorsey's taped statement does not require reversal of the instant conviction as it is highly probable that it did not contribute to the verdict.[8]

2. We reject the contention that the taped statement of Dorsey contained an improper comment on Hill's silence after Dorsey confronted him about the victim's accusation of rape. Our review of the tape, as well as the portions thereof cited in the appellant's brief, shows that Hill did not remain silent in the face of the victim's rape allegation, but "[h]e said fuck that shit or something like that. He

---

[6] *In the Interest of D. S. R.*, 246 Ga. App. 426, 427 (2) (541 SE2d 61) (2000).

[7] See *Moore v. State*, supra at 644 (2); *Assad v. State*, supra at 693 (2).

[8] *Johnson v. State*, 238 Ga. 59, 61 (230 SE2d 869) (1976).

was cursing." We will not construe Hill's responsive expletives as denoting a "tacit[ ] acquiesce[nce] by remaining silent"[9] so as to warrant reversal.

3. Hill challenges the sufficiency of the evidence. On appeal, the evidence must be viewed in a light most favorable to the verdict, and Hill no longer enjoys a presumption of innocence; "moreover, on appeal this [C]ourt determines evidence sufficiency, and does not weigh the evidence or determine witness credibility."[10] In that regard, the evidence in this case was not overwhelming. From the record, the verdict was based on the jury's determination as to who was telling the truth about what happened between Hill and the victim *prior* to their arrival at the Valley Brook residence referred to as "George's house," facts to which only the victim and Hill were privy. Such credibility determination is solely within the province of the jury and will not be disturbed by this Court; for us, "[t]he evidence is sufficient as a matter of law if, when viewed in the light most favorable to the verdict, a rational trier of fact could find all the essential elements of the crimes charged beyond a reasonable doubt."[11]

Here, the victim testified that, prior to arriving at George's house, Hill entered her minivan; held a knife to her throat; forced her into the back of her van, causing injury to her neck; drove her van to another location; forced her to commit oral sodomy on him; and forced her to have sexual intercourse with him. This testimony of the victim, alone, was sufficient for a rational trier of fact to have found beyond a reasonable doubt each of the elements of the offenses for which Hill was convicted.[12] Accordingly, the evidence is sufficient as a matter of law to uphold the verdict.

4. Hill contends that, following a *Jackson-Denno*[13] hearing, the trial court erred in admitting his inculpatory in-custody statement, because he was under the influence of cocaine and alcohol at the time the statement was made. We find no error.

Unless clearly erroneous, a trial court's findings as to factual determinations and credibility relating to the admissibility of the defendant's statement at a *Jackson-Denno* hearing will be upheld on appeal.[14] Whether there was a knowing and voluntary waiver of rights depends upon the totality of the circumstances. In this case, the record shows that Hill was read the *Miranda*[15] warnings at the

---

[9] *Wallace v. State*, 272 Ga. 501, 503 (2) (530 SE2d 721) (2000).

[10] (Citations omitted.) *Grant v. State*, 195 Ga. App. 463, 464 (1) (393 SE2d 737) (1990).

[11] (Footnote omitted.) *Shaw v. State*, 247 Ga. App. 867, 869 (2) (545 SE2d 399) (2001).

[12] *Smith v. State*, 246 Ga. App. 191, 192 (539 SE2d 881) (2000). See also OCGA § 24-4-8 (testimony of a single witness sufficient to establish a fact).

[13] *Jackson v. Denno*, 378 U. S. 368 (84 SC 1774, 12 LE2d 908) (1964).

[14] *Vansant v. State*, 264 Ga. 319 (443 SE2d 474) (1994).

[15] *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966).

beginning of his statement and signed a waiver of rights form. He affirmed that he understood his rights, that he was aware of his surroundings, that his statement was voluntary, and that he was not required to respond to the officers' questions. At the *Jackson-Denno* hearing, the officers who interviewed Hill testified that he was coherent, that his answers were responsive to the questions, and that he did not appear to be under the influence of drugs or alcohol. Under the totality of these circumstances, the trial court was authorized to find that Hill knowingly waived his rights, despite his purported previous consumption of alcohol and drugs. The trial court's finding, supported by the evidence, is not clearly erroneous and must be upheld.[16]

*Judgment affirmed. Andrews, P. J., and Miller, J., concur.*

DECIDED JULY 31, 2001.

*Ruth L. Rocker*, for appellant.

*J. Tom Morgan, District Attorney, Barbara B. Conroy, Jeanne M. Canavan, Joseph N. Walden III, Assistant District Attorneys*, for appellee.

---

[16] *Bishop v. State*, 268 Ga. 286, 288 (2) (486 SE2d 887) (1997).