[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-15442

_____

D.C. Docket No. 5:08-cv-00091-HL

JOSHUA DANIEL BISHOP,

Petitioner - Appellant,

versus

WARDEN, GDCP,

Respondent - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(August 8, 2013)

Before BARKETT, MARCUS and MARTIN, Circuit Judges.

MARCUS, Circuit Judge:

Petitioner Joshua Daniel Bishop was convicted in 1996 of malice murder

and armed robbery, and sentenced to death. He appeals from the district court's

denial of habeas relief, raising two categories of claims: (1) three instances of ineffectiveness of trial counsel, see Strickland v. Washington, 466 U.S. 668 (1984); and (2) a violation of Brady v. Maryland, 373 U.S. 83 (1963).  After thorough review, we conclude that Bishop is not entitled to relief on any of these claims, and accordingly affirm.

I.

A.

The basic facts surrounding the murder were set forth by the Georgia Supreme Court on direct appeal:

> [Leverett] Morrison drove Bishop and Bishop's co-indictee, Mark Braxley, to a bar.  Bishop and Braxley decided to steal Morrison's car. The three left the bar around 11:00 p.m. and drove to Braxley's trailer. Bishop reached into the sleeping Morrison's pocket for the car keys, but Morrison awoke and sat up.  Bishop began to beat Morrison about the head and face with a blunt object.  When Morrison was unconscious, Bishop took the car keys.  Eventually realizing that Morrison was dead, Bishop and Braxley wrapped and then loaded the body into the back seat of Morrison's car.  They drove to a dumpster which was located a short distance from Braxley's trailer.  After unsuccessfully attempting to toss Morrison's body into the dumpster, Bishop and Braxley left the body on the ground where it was discovered several hours later.  They drove Morrison's car into the nearby woods, set it on fire, and then walked back to Braxley's trailer to dispose of evidence of their crimes.  After his arrest, Bishop made a statement in which he admitted delivering the blows with a wooden rod until Morrison stopped breathing, and described how he and Braxley disposed of the body and burned the car.  Bishop subsequently confessed that, some two weeks prior to the murder of Morrison, he participated in the murder of Ricky Lee Wills and that he buried Wills' body in the woods near Braxley's trailer.  After investigators recovered Wills' body, a grand jury indicted Bishop and

2

Braxley for that murder as well.  The trial court admitted evidence regarding Bishop's participation in Wills' murder in aggravation of punishment during the penalty phase of this trial for Morrison's murder.

Bishop v. State, 486 S.E.2d 887, 891 (Ga. 1997).

Although both Bishop and Braxley initially denied any involvement in the murder of Morrison, Bishop later confessed in a statement given to Detective Ricky Horn.  In his statement, which was audiotaped and played by the State for the jury, Bishop explained at considerable length the events culminating in the beating and murder of Morrison on the night of June 24, 1994.  Bishop, Braxley, and Morrison had been drinking through the afternoon and had smoked crack later that evening.  That night, Braxley suggested that Bishop take the keys to Morrison's Jeep; Morrison was lying in bed at the time.  According to Bishop, when he reached into Morrison's pocket, Morrison "popped [him] and asked [him] what [he] was doing."  Bishop then hit Morrison with a wooden stick that "was like a closet rod."  In Bishop's words, he used "[o]ne of them big heavy closet rods."  Bishop explained, "I hit him too hard, I reckon, and he didn't say anything. He just wouldn't breathe."  At one point in his statement Bishop said that he hit Morrison on the backside of his head "about twice" and Braxley hit him "about three times," but later, Bishop claimed, "I hit [Morrison] like three times in the head with that stick, just to see the first time if I could knock him out where I could

3

get his keys.  But he wouldn't knock out.  I hit him one more time and finally, he looked like he was knocked out."

According to Bishop, he then exited the room, but left the key to Morrison's Jeep on a coffee table.  Bishop added that, while he was outside the room, he "heard something loud."  He elaborated: "When I went back in there after I left the key on the coffee table, I walked back there and saw that [Morrison] was dead.  I saw we were messing up pretty bad.  He wasn't breathing.  I checked him out and he wasn't breathing.  He was dead."  Bishop explained that he and Braxley then wrapped Morrison in a comforter and placed his body in the back seat of the Jeep, and that they tried unsuccessfully to put Morrison's body in a dumpster but ended up leaving the body between two dumpsters.  At Braxley's suggestion, Bishop took the Jeep to a nearby pond, poured gasoline all over it, and lit it on fire, destroying all but the frame of the vehicle.

Finally, Dr. James Dawson testified regarding Morrison's injuries and cause of death.  He determined that Morrison died in the early morning hours of June 25, 1994, as a result of inner cranial bleeding, with contributing factors of a cerebral contusion and aspiration of blood, all caused by blunt force trauma to the head.  Dr. Dawson confirmed that Morrison was beaten to death.  Several of Morrison's seven significant head wounds appeared to have been caused by a cylindrical, circular, or tubular object, while other wounds appeared to have been caused by a

4

flat object.  Dr. Dawson could not state the order in which the seven injuries took place, nor could he state whether the first blow, the seventh blow, any of the blows in between, or any combination of the blows caused the cerebral contusion (bruising of the brain) or the hemorrhage resulting in inner cranial bleeding and ultimately death; finally, the medical examiner confirmed that all seven injuries occurred while Morrison was alive.

## B.

On February 8, 1996, a Georgia jury found Bishop guilty of malice murder and armed robbery.  The trial then proceeded to the penalty phase.  The State's presentation largely detailed Bishop's involvement in the murder of another individual, Ricky Willis,[1] a short time before Bishop killed Morrison.  The jury heard from a jailhouse informant, Seth Hatchett, that Bishop told him Bishop had killed Willis by beating Willis in the head and cutting his throat.  The State also presented Joel Jason Arnett, who recalled that Bishop threatened Arnett at a local bar, the Hilltop Grill, on the night of June 18, 1994.  Bishop told him, "I've already got one mother fucker buried down there and I'll put you down there," "down there" referring to the ground near Braxley's trailer.  Arnett's testimony was thoroughly impeached, however, by the testimony of Delores Forshaw, who was at the Hilltop Grill on the night of the alleged threats; she claimed to have seen a fight

---

[1] The record shows that Ricky Willis also went by the name Ricky Wills, and witnesses confirmed that he went by both names.  **[DE 10 Ex. 95 at 18 & n.84.]**

between Braxley -- not Bishop -- and Arnett, during which Braxley beat Arnett with a stick.  In addition, Chief Deputy Sheriff Howard Sills testified that Bishop was in jail for a nine-day period that included the night of the alleged threats.

The State also presented a tape recording of a portion of Bishop's interview with law enforcement concerning the death of Willis.  Bishop explained that two to four weeks before the murder, his mother had been staying with Willis.  His mother told him that Willis had sexually assaulted her.  Bishop confronted Willis, Willis admitted the conduct, and Bishop "slapped the shit out of him and knocked him on the bed."  The next day, Bishop learned that Willis had been bragging about his encounter with Bishop's mother.  Bishop began beating Willis repeatedly with his fists, causing Willis to hit his head on a metal door jamb and resulting in Bishop breaking his own knuckle.  According to Bishop, as Willis lay on the ground, Braxley thought Willis was dead; Braxley instructed Bishop to "finish" Willis off with a butcher knife.  Bishop claimed he only hit Willis with his fists and never intended to kill him, and that Braxley was the one who grabbed the knife and cut Willis' throat.

Bishop further explained how he, again at Braxley's direction, helped drag Willis' body to the edge of the woods near Braxley's trailer, where the two men dug a hole and buried the body the following morning.  Bishop said that Willis was "sticking out" of the hole at first, but Braxley "mashed him down in there" when

Bishop went off to get a garden rake.  Bishop also said that one night shortly after Willis' death, Bishop watched Braxley sharpen the knife used to kill Willis, and Bishop noticed that Braxley had wrapped electrical tape around the handle.

The State also presented the testimony of the medical examiner who performed an autopsy on Willis.  Dr. Anthony Clark testified that the cause of death was sharp force wounds (stabbing or slashing) to the neck, although the other injuries may have been contributing factors.

Finally, the State offered the testimony of Bennie Aycock, a lifelong friend of Bishop's.  In April 1994 (a few months before the murders of Willis and Morrison), Bishop and Aycock got into a fight over Aycock's missing hunting gun.  According to Aycock, Bishop hit him with an object, possibly a brick, breaking his nose and cheekbone, knocking out one of his teeth, and causing permanent nerve damage to his face.  Aycock got in his truck and drove off, but testified that he blacked out and awoke on the side of the road, where he managed to walk to a friend's house and call 911.

## C.

Defense counsel then presented an extensive mitigation case.  Thirteen witnesses in all were called by Bishop.  Although Bishop claims that counsel's main strategy at the penalty phase was to establish that Braxley was the more culpable actor, the actual penalty phase strategy was more complex than that.  In

7

fact, a three-fold strategy was presented, as trial counsel Combs testified during the state habeas proceedings: the use of residual doubt from the guilt phase to establish again that Braxley was the more culpable actor; the presentation of extensive background concerning Bishop's tragic upbringing; and finally, the use of a psychiatric diagnosis from Dr. Thomas Brown. We summarize the mitigation presentation in some detail, because it bears directly on Bishop's claims that his counsel performed ineffectively at the penalty phase.

First, defense counsel's opening argument at the penalty phase urged the jury to "consider what is known in the law as residual or lingering doubt that you may have as to who actually took the life of Leverett Lewis Morrison." At the guilt phase, counsel had pointed out the age difference between the nineteen year old Bishop and the thirty-five year old Braxley. Counsel also had sought to emphasize, based on Bishop's statements to law enforcement, that although Bishop beat Morrison over the head, he left the room after taking Morrison's car keys and Braxley was the one who administered the fatal blow.

During the penalty phase, defense counsel called Daphne Knowles, who further impeached the testimony of Arnett. Knowles testified that she was at the Hilltop Grill on the night Bishop allegedly threatened Arnett, and that Arnett and Braxley were at the restaurant. Defense counsel next called Braxley's girlfriend Sylvia Stiles and her son Stephen to show that a butcher knife with electrical tape

8

around the handle, which was recovered from a tackle box in Sylvia Stiles' house by law enforcement officers, belonged to Braxley.

The mitigation presentation then detailed at length Bishop's terrible childhood.  Much of the testimony was apparently emotional, leaving some jurors and others in the courtroom in tears.  Indeed, counsel Combs testified that the presentation of Bishop's mother was "the high point emotionally of the case." Bishop first called Angela Prosser, an employee of the Baldwin County Department of Family and Children's Services ("DFACS").  She explained that DFACS came into contact with the Bishop family back in 1972, before Bishop was even born, and there was regular contact between case workers and the family from 1972 through January 1975 for checkups and in order to respond to repeated reports of parental neglect.  Prosser said that there were many instances when Bishop and his older brother Michael went unsupervised.  Moreover, case workers observed the use and abuse of drugs and alcohol in the home, along with many incidents of family violence.  Prosser testified about a shooting incident while a young Bishop and his brother were at home.

Prosser amplified that in 1981, when Bishop was only about 6 years old, DFACS took Bishop and his brother into temporary custody for the first time.  But it was hardly the last; from that point forward, Bishop and his brother were moved in and out of several foster and group homes, periodically returning to their

9

mother's custody. But each time they returned, the mother's alcohol abuse, violent relationships, and total lack of supervision resulted in Bishop and his brother being returned to state custody. Prosser also described Bishop as a lovable and polite child who never exhibited any signs of violence. Prosser added that she became attached to the family and that Bishop showed real concern about his mother and her problems with alcoholism.

Another DFACS case worker, Ida Hart Freeman, similarly testified that Bishop was sweet, quiet, and passive, and that he had a strong bond with his mother. Freeman also testified that Bishop's mother had a violent relationship with her boyfriend; she failed to provide a safe and stable home; and she was often visibly intoxicated when she visited her children. Still a third case worker, Lucy Stewart, testified. She observed the petitioner during his early teenage years, noting that he was very friendly and polite, although withdrawn. She too described Bishop's mother as an unreliable alcoholic, but noted Bishop held out the hope that his mother would get better and he could eventually live with her. She testified that Bishop's own behavior went downhill, that he was placed in a local youth detention center, and that he developed problems with drugs and alcohol. And, as Stewart explained, Bishop and his mother were often left homeless, living "a hand to mouth existence."

10

Defense counsel also presented the expert testimony of Dr. Thomas W. Brown, a psychiatrist specializing in the treatment of drug and alcohol dependency. Brown opined that Bishop could think clearly and did not suffer from any mental abnormalities, but did evince a pattern of emotional problems and unexplained aggressive outbursts throughout his life. Brown explained that a biochemical disorder called "intermittent explosive disorder" ("IED") caused Bishop to develop these outbursts and a loss of control. Dr. Brown also offered that Bishop suffered from bipolar disorder. He added that in June 1994, at the time of the murders, Bishop suffered from at least four years of alcohol and drug dependency. He noted Bishop's history of inhaling gasoline fumes and his "peculiar devotion to his mother through thick and thin." Finally, Brown opined that Bishop would function well in a controlled prison environment, and that intermittent explosive disorder can be treated successfully with medication.

The defense also presented the testimony of three of Bishop's foster parents and one group home administrator. Weldon Brooks, Bishop's foster father in the early 1980's, testified that Bishop was a good boy who didn't cause major problems and was a "victim of circumstances." Jeffrey Lawrence, an assistant administrator at the group home where Bishop lived between the ages of 12 and 14, likewise said that Bishop was affectionate, sweet, kind, and well-mannered, and that he bonded quickly with the staff. Lawrence also described periodic

episodes of anger where Bishop would have to be restrained, but that Bishop later would express remorse and accept responsibility for his behavior.  In 1989, at the end of his stay, Bishop's aggressive behavior escalated and he was removed from the home.  Another of Bishop's foster parents, Roy Thigpen, observed that Bishop's mother was bruised, and apparently beaten on more than one occasion.

Bishop's older brother Michael testified that he was the primary caregiver for Bishop, because of their mother's extensive alcohol and drug addiction. Michael explained that violence permeated their household almost every day.  He recounted an incident when his mother Carolyn's off-again-on-again boyfriend Townsend fired a gun at the trailer where the family was staying, and the mother's boyfriend at the time returned gunfire, hitting Townsend.  Michael also described how their mother would take him and Bishop to a babysitter and leave them for up to a week at a time.  Like some of the other witnesses, Michael explained that as Bishop got older, Bishop began inhaling gasoline fumes and later developed a problem with alcohol and drugs.

Finally, Bishop's mother Carolyn testified. She said that her own parents were alcoholics, and that she was raped by a friend of her parents when she was only twelve years old.  Carolyn also spent time in the foster system.  She developed a drinking problem shortly afterwards, and married Michael Bishop, Sr., the father of her eldest son Michael.  Michael Bishop, Sr. left, and Carolyn began

seeing several men, including Ray Morrison (the victim Leverett Morrison's brother). She became pregnant with Bishop; she never knew for certain who Bishop's biological father was.

Carolyn described her drug and alcohol abuse; she admitted that she abused drugs and alcohol while pregnant with Bishop, and that she used drugs and alcohol with Bishop as he grew up. In fact, she relayed an anecdote from when Bishop was three or four: she caught Bishop drinking from one of her beers, so she made Bishop and his brother each drink an entire beer.

After spending some time in state custody, Bishop was returned to the care of his mother when he was about 14 years old. Carolyn said she knew he was drinking, inhaling gasoline, and taking pills. Carolyn herself was in and out of jail with no permanent place to stay, so Bishop would live at different places with or without her, including in cars or under a bridge. In January 1994, Carolyn was released after serving over a year in prison. She explained that she and Bishop begged and performed odd jobs to earn enough to survive; they pooled their money for the purchase of food, alcohol, and drugs. Carolyn also testified that she was sexually assaulted one night in late May 1994 by Willis, and that Bishop woke up and intervened on her behalf. Carolyn concluded her emotional testimony by begging the jury to spare her son's life and blaming herself for the horrible life he had led.

13

D.

On February 12, 1996, the jury, after approximately nine hours of deliberation, found a statutory aggravating circumstance -- that Bishop murdered Morrison while engaged in armed robbery[2] -- and unanimously recommended a sentence of death.  The following day, the trial court sentenced Bishop to die in accordance with the jury's recommendation, and sentenced Bishop to a consecutive life sentence for the armed robbery conviction.

After unsuccessfully moving for a new trial, Bishop appealed to the Georgia Supreme Court, which affirmed his convictions.  Bishop, 486 S.E.2d 887, cert. denied, 522 U.S. 1119 (1998), reh'g denied, 523 U.S. 1089 (1998).  Bishop then filed a state habeas petition in the Superior Court of Butts County raising numerous Strickland claims, including the three presented to this Court.  The state habeas court conducted an evidentiary hearing and denied Bishop's petition in its entirety. The Georgia Supreme Court denied Bishop's application for a certificate of probable cause to appeal and motion for reconsideration.

On March 28, 2008, Bishop filed his federal habeas petition in the United States District Court for the Middle District of Georgia.  After limited discovery, the district court denied all of Bishop's claims and rejected his Rule 59 motion to

---

[2]  See O.C.G.A. § 17-10-30(b)(2) (aggravating circumstance where "[t]he offense of murder, rape, armed robbery, or kidnapping was committed while the offender was engaged in the commission of another capital felony or aggravated battery").

alter or amend the judgment.  The district court granted a Certificate of Appealability (COA) on three Strickland claims, and we expanded the COA to include a Brady claim.

## II.

Because Bishop commenced his federal habeas petition after the 1996 effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254, AEDPA governs the petition and the scope of our review.  Penry v. Johnson, 532 U.S. 782, 792 (2001); Grossman v. McDonough, 466 F.3d 1325, 1335 (11th Cir. 2006).  The basic law is clear.  Under AEDPA, when a state court has adjudicated the petitioner's claim on the merits, a federal court may not grant habeas relief unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2).  A state court's factual findings are presumed correct unless rebutted by clear and convincing evidence.  Id. § 2254(e)(1); Ferrell v. Hall, 640 F.3d 1199, 1223 (11th Cir. 2011).

AEDPA "imposes a highly deferential standard for evaluating state court rulings" and "demands that state-court decisions be given the benefit of the doubt."  Renico v. Lett, 130 S. Ct. 1855, 1862 (2010) (internal quotation marks omitted).

15

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 131 S. Ct. 770, 786 (2011) (internal quotation marks omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003)). The Supreme Court has repeatedly instructed lower federal courts that an unreasonable application of law requires more than mere error or even clear error. See, e.g., Mitchell v. Esparza, 540 U.S. 12, 18 (2003); Lockyer, 538 U.S. at 75 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); Williams v. Taylor, 529 U.S. 362, 410 (2000) ("[A]n unreasonable application of federal law is different from an incorrect application of federal law.").

Our review of the district court's decision to deny habeas relief is de novo. Spencer v. Sec'y, Dep't of Corr., 609 F.3d 1170, 1177 (11th Cir. 2010); Fotopoulos v. Sec'y, Dep't of Corr., 516 F.3d 1229, 1232 (11th Cir. 2008). We review any factual findings made by the district court for clear error, however. Spencer, 609 F.3d at 1177.

A.

16

To succeed on an ineffective assistance of counsel claim, Bishop has the burden of demonstrating both deficient performance and prejudice: he must establish both that "counsel's representation fell below an objective standard of reasonableness," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 688, 694 (1984); accord Wiggins v. Smith, 539 U.S. 510, 521-22 (2003); Darden v. Wainwright, 477 U.S. 168, 184 (1986). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. The Supreme Court also made clear in Strickland that a court need not address both prongs if the petitioner has made an insufficient showing on one of them, and that "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." Id. at 697; accord Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000) ("[T]he court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa." (citation omitted)).

Moreover, we do not apply Strickland de novo, but rather through the additional prism of AEDPA deference. See 28 U.S.C. § 2254(d)(1). Under this standard, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable." Richter, 131 S. Ct. at 785; accord id. ("A

state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself."). With these principles in mind, we address each Strickland claim in turn.

1.

Bishop first says that his trial counsel, Brian Combs and Reginald Bellury, were ineffective in the penalty phase for failing to introduce the testimony of the lead law enforcement officers -- Sheriff William Massee, Jr., Chief Detective Ricky Horn, and Chief Deputy Howard Sills -- concerning their opinions about Bishop's apparent remorse and relative culpability.

The law enforcement officers did not testify in person during the state habeas proceedings; rather, Detective Horn and Deputy Sills submitted written affidavits.[3] Detective Horn's affidavit says that he is a strong supporter of capital punishment, but that he has always believed that a life without parole sentence would be an appropriate punishment for Bishop. Detective Horn explained that when he spoke to Bishop sometime after the investigation, Bishop "appeared to [him] to be remorseful for his crimes." Horn also said that he was skeptical of co-defendant Braxley's exculpatory account of the murders. Finally, Detective Horn opined that a death sentence for Bishop was inappropriate because Braxley had received a lighter sentence.

---

[3] There was no testimony from Sheriff Massee at the habeas proceedings.

18

Deputy Sills' affidavit is similar in some respects.  He averred that Bishop "is the kind of person who will tell the whole truth when he realized you have the goods on him," while Braxley was the "kind of liar" you "never get the real story from."  He pointed out that both men initially denied their roles in the murders of Morrison and Willis, but that he believed Bishop came clean, while Braxley never did.  Deputy Sills also said that during his interactions with Bishop, the petitioner appeared to be truthful and remorseful.  Sills explained that he was a strong supporter of capital punishment, but unlike Horn, he did not believe Bishop should have received a life sentence.  Rather, he thought that both Bishop and Braxley should have gotten the death penalty.

Bishop's counsel learned of the law enforcement officers' opinions prior to trial.  The officers had spoken to defense counsel for the purpose of helping them negotiate a plea with the District Attorney -- a negotiation that was ultimately unsuccessful.  However, the officers unequivocally said that their opinions were "off the record," and that they were unwilling to voice such opinions on the witness stand.  Counsel Combs testified at the state habeas proceeding that the officers made the comments "when we were one-on-one," that it was made clear to him that the officers "were not going to go on the record," and that, when he asked Deputy Sills whether he would go on the record, Sills replied with "something to the effect of, you know, hell, no, I'm not going to help you on that."

19

The state habeas court denied Bishop's Strickland claim on both performance and prejudice grounds.  At the outset, to the extent Bishop claims relief is warranted because the state habeas court engaged in little analysis and summarily found no prejudice, the argument is without merit.  It is by now abundantly clear that AEDPA deference applies to summary dispositions of a state court, because "§ 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'"  Richter, 131 S. Ct. at 785; accord id. at 784 ("There is no text in the statute requiring a statement of reasons.").  Moreover, "[a] judicial decision and a judicial opinion are not the same thing," and even prior to Richter, it had long been the law in this Circuit that nothing in AEDPA "requires the state court adjudication that has resulted in a decision to be accompanied by an opinion that explains the state court's rationale." Wright v. Sec'y, Dep't of Corr., 278 F.3d 1245, 1255 (11th Cir. 2002).  As we explained, "[t]elling state courts when and how to write opinions to accompany their decisions is no way to promote comity" and "[r]equiring state courts to put forward rationales for their decisions so that federal courts can examine their thinking smacks of a 'grading papers' approach that is outmoded in the post-AEDPA era."  Id. (citing Hennon v. Cooper, 109 F.3d 330, 335 (7th Cir. 1997)).  Our task is to determine whether the decision of the state habeas court was an unreasonable application of Strickland.

20

We need not address counsel's performance, because, even if we were to assume that counsel were ineffective in failing to call the officers, the state court's prejudice determination was not an unreasonable one.  The officers' testimony would not have undercut in any way the conduct Bishop himself admitted to, including striking the first blows against both Morrison and Willis, dumping the victims' bodies, and stealing Morrison's Jeep.  Relatedly, the officers' testimony also would not have undermined in any way the statutory aggravator found by the jury -- that Bishop committed the murder of Morrison during the course of an armed robbery.

Moreover, putting the officers on the stand was a double-edged sword, and could have harmed Bishop in a variety of ways.  Defense counsel were told by the officers, in no uncertain terms, that they were willing to offer their opinions to help counsel obtain a plea for Bishop, but that they were unwilling to testify at trial.  Bishop claims that his counsel's fear that the officers might lie was unreasonable, but, even if we were to accept this, the downside risks were broader.  Two hostile officers could have answered counsel's questions curtly, evasively, or not at all.  And even assuming they would have expressed an opinion about Bishop's remorse, the officers could also have highlighted the egregious nature of the murders, including the savage beatings of both Morrison and Willis, which were initiated by Bishop, not Braxley.  Similarly, the officers could have underscored

21

Bishop's admitted involvement in disposing of the bodies and his theft of the victim Morrison's Jeep and its ultimate destruction. Moreover, the officers undoubtedly would have been asked to highlight that there were two murders at issue here, not just the one, and that Bishop was, by his own words, heavily involved in both. Finally, it would have been impossible for the officers to opine at Bishop's trial about any disparity in sentence between Bishop and Braxley, because Bishop was sentenced to death before Braxley took a plea to a life sentence.[4]

We do not suggest with certainty that the officers' testimony would have been unhelpful to Bishop. But our review is constrained by the requirements of AEDPA. In light of all of the evidence presented and the dangers inherent in questioning the officers on matters they were unwilling to share at trial, we cannot say that the state court's prejudice determination was objectively unreasonable. See Richter, 131 S. Ct. at 786-87.

## 2.

Bishop also claims that his counsel were ineffective because they failed to present more evidence of Braxley's bad character, his criminal history, and his past incidents of violence. This evidence included information about Braxley's

---

[4] Indeed, as set forth infra at 26-30, we are obliged to accept as correct the state court's finding that Braxley had not even been offered a plea before the close of Bishop's trial.

22

criminal record, his history as a drug dealer, and his violent behavior towards more than one of his past girlfriends.

The state habeas court rejected this claim too on both Strickland prongs. The court held that counsel were not ineffective, because the additional evidence would not have been admissible under Georgia law. The court also held that Bishop failed to show prejudice.

Bishop is not entitled to federal habeas relief on this claim either. The additional evidence may have been admissible as mitigation, but we cannot conclude that the state court's prejudice determination was an unreasonable one. In the first place, the additional evidence was largely cumulative. The state habeas court found, and the record fairly reflects, that the jury learned that Braxley used drugs, abused alcohol, engaged in violent acts, and acted deceptively. Moreover, as the state court noted, the additional evidence did not in any way alter the fact that Bishop admitted to having reasons to attack Morrison and Willis, that Bishop in fact struck Morrison in the head many times with a heavy rod, and that Bishop initiated the beating of Willis and delivered repeated violent blows to Willis, causing Bishop to break his own knuckle in the process. In other words, the evidence showed that Bishop, not Braxley, initiated the violence that led to the deaths of both Morrison and Willis. Finally, we observe that additional evidence concerning Braxley's violence towards his past girlfriends is far more tenuously

23

connected to the murders at issue than Bishop's own admitted conduct.  On this ample record, we cannot find that the state court's prejudice determination was objectively unreasonable.

3.

Bishop's final Strickland claim is that his counsel were ineffective for failing to request funds for and failing to present the testimony of a forensic blood spatter expert.  Bishop argues that this mitigating evidence would have demonstrated Braxley's involvement in the beating and murder of Morrison.

The state habeas court addressed and rejected this claim too, both on performance and prejudice grounds.  The court held that counsel performed reasonably by using their limited funds to hire other experts to assist in mitigation, and that Bishop failed to show prejudice because the State did not dispute that Braxley was involved in the two murders.  There was nothing unreasonable about either determination.  As for the performance prong, when a "Petitioner's claim is that his trial counsel should have done something more, we first look at what the lawyer did in fact."  Williams v. Allen, 598 F.3d 778, 793 (11th Cir. 2010) (internal quotation marks and alterations omitted).  Counsel put forth an extensive mitigation presentation that focused on Bishop's horrific childhood and troubled adolescence and his mental infirmities.  Moreover, counsel did not neglect to seek funds for expert assistance.  On the contrary, counsel moved the trial court several

24

times for funding, received some but not all of the funds they requested, and used their limited funds to hire an investigator, a psychologist, a psychiatrist, and a jury consultant. In fact, the state habeas court found that counsel Combs spent approximately six thousand dollars of his own money on the experts they hired. Nor does petitioner tell us which expert should have been cast aside to make funds available for a blood spatter expert.

In any event, we're hard-pressed to see how the defendant was prejudiced. The blood spatter evidence, even if it corroborated Bishop's account that Braxley was in the room and took part in the beating of Morrison, did not lessen in any way Bishop's involvement in the murder, including Bishop's admission that he initiated the beating and struck Morrison with a heavy rod to the point of not breathing. In addition, no one at trial ever disputed Braxley's involvement in the murder of Morrison. Indeed, it was the <u>State</u> that put before the jury Bishop's statements to law enforcement suggesting that Braxley delivered the fatal blow. In closing argument at the guilt phase, the prosecutor explained to the jurors that if they believed Bishop's account that he only hit Morrison two times and that "Braxley finished [Morrison] off . . . [Bishop is] still guilty of murder." The State also acknowledged at both phases of the trial Braxley's presence at the scene and his participation in dumping the body of the victim.

25

In light of the evidence as a whole, including Bishop's admitted role in beating Morrison and Willis, disposing of the bodies, stealing the victim Morrison's Jeep, and burning that Jeep, the state court's Strickland determination was not objectively unreasonable.

B.

Finally, Bishop claims that the prosecution violated  Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972).  At several points during Bishop's trial, the prosecutor said that Bishop's co-defendant Braxley would have his day in court and that another jury would weigh in on Braxley's part in the crimes.  Bishop claims that these statements were false and misleading because Braxley had already been offered a plea to a life sentence, and that the prosecution suppressed the evidence of this plea offer by failing to disclose it to Bishop's defense counsel.

The district court, like the state habeas court, determined that Bishop's Brady claim was procedurally defaulted because it was not raised at trial or on direct appeal.  "Federal courts may not review a claim procedurally defaulted under state law if the last state court to review the claim states clearly and expressly that its judgment rests on a procedural bar, and the bar presents an independent and adequate state ground for denying relief."  Hill v. Jones, 81 F.3d 1015, 1022 (11th Cir. 1996) (citing Harris v. Reed, 489 U.S. 255, 260-61, 263

26

(1989)).  The state habeas court clearly and expressly held that Bishop's Brady claim was procedurally barred: "Bishop's claims of prosecutorial misconduct and corresponding denial of his constitutional rights concerning Braxley's plea are procedurally defaulted."

Procedural default may be overcome, however, by a showing of (1) cause and prejudice; or (2) a fundamental miscarriage of justice.  Id. at 1022-23.  Bishop concedes the default and does not claim there has been a fundamental miscarriage of justice, but he asserts that he has shown cause and prejudice to overcome his procedural default.  As a general matter, "cause" for procedural default exists if "the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."  Murray v. Carrier, 477 U.S. 478, 488 (1986).  In the context of Brady claims, the state's suppression of evidence may amount to "cause."  Banks v. Dretke, 540 U.S. 668, 691 (2004); Strickler v. Greene, 527 U.S. 263, 282 (1999).

To show cause in this case, Bishop must first establish that there was something for the State to suppress; namely, that the District Attorney Fred Bright offered Braxley a plea prior to the close of Bishop's trial.  The state habeas court found otherwise.  After hearing conflicting evidence on the timing of the plea offer, the state habeas court credited the testimony of District Attorney Bright and made a square factual finding that Bright did not make an offer before the

27

conclusion of Bishop's trial. We must presume this factual finding is correct, and Bishop bears the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Clear and convincing evidence is a "demanding but not insatiable" standard, requiring proof that a claim is highly probable. Ward v. Hall, 592 F.3d 1144, 1177 (11th Cir. 2010) (quoting Miller-El v. Dretke, 545 U.S. 231, 240 (2005)). "Highly probable" is a standard that requires "more than a preponderance of the evidence but less than proof beyond a reasonable doubt." Id.

Bishop has failed to meet this burden. The evidentiary picture before the state habeas court was this. It is undisputed that Braxley took a plea to a life sentence on September 11, 1996, well after the conclusion of Bishop's trial in February of that year. The issue was when the plea was offered. District Attorney Bright testified in the state habeas proceeding that he did not make an offer prior to the close of Bishop's trial. In contrast, Bishop presented testimony from Andrew Prince (Braxley's counsel), Prince's paralegal, and other attorneys involved in Braxley's defense. Prince recalled that there was a plea offer on the table during Bishop's trial, although he did not have any notes from the case or other evidence to support his recollection. None of the other defense attorneys claimed direct knowledge of the timing of the plea offer; rather, their affidavits described a meeting that took place on February 13, 1996, one day after Bishop was sentenced

28

to death, at which they recalled discussing that there was an open plea offer to Braxley.

The record reflects that both District Attorney Bright and Braxley's counsel Prince claimed direct knowledge of the timing of the plea offer.  Both were armed only with their own recollections, and neither possessed any additional evidence conclusively documenting the timing of the plea offer.  The state habeas court heard from both witnesses and, as we've said, credited Bright's recollection over Prince's.  In the absence of clear and convincing evidence, we have no power on federal habeas review to revisit the state court's credibility determinations.  See Marshall v. Lonberger, 459 U.S. 422, 434 (1983) (federal habeas courts have "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them"); Consalvo v. Sec'y, Dept. of Corr., 664 F.3d 842, 845 (11th Cir. 2011) (denying habeas relief on Brady and Giglio claims that "turn[ed] upon credibility," because "[d]etermining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review"); see also Turner v. Crosby, 339 F.3d 1247, 1273 (11th Cir. 2003) (The deference compelled by AEDPA "requires that a federal habeas court more than simply disagree with the state court before rejecting its factual determinations. Instead, it must conclude that the state court's findings lacked even fair support in the record." (quoting Lonberger, 459 U.S. at 432)).  The state court's factual

finding found fair support in the record testimony of District Attorney Bright; there was no clear and convincing evidence to rebut that testimony.  28 U.S.C. § 2254(e)(1).  Quite simply, Bishop cannot show cause to overcome his procedural default, and therefore we have no need to address whether he has shown actual prejudice.  See, e.g., Howard v. United States, 374 F.3d 1068, 1072 (11th Cir. 2004).

Accordingly, we affirm the district court's denial of habeas relief.

**AFFIRMED.**